## HOVEY *v.* ELLIOTT.

ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

No. 255.  Argued March 30, 31, 1897. — Decided May 24, 1897.

It is not within the power of the Supreme Court of the District of Columbia to order the answer of the defendant in a chancery suit pending in that court to be stricken from the files, and a decree to be entered that the bill be taken *pro confesso* against him, simply because he was held to be guilty of contempt in neglecting to pay into court money held by him which was the subject of controversy in the suit, and declined to appear when summoned to do so.

A court possessing plenary power to punish for contempt, unlimited by statute, has not the right to summon a defendant to answer, and then after obtaining jurisdiction by the summons, refuse to allow the party summoned to answer or strike his answer from the files, suppress the testimony in his favor, and condemn him without consideration thereof and without a hearing, on the theory that he has been guilty of a contempt of court.

The judicial history of the law concerning contempt of court in England and in this country reviewed and considered.

THE case is stated in the opinion.

*Mr. Everett P. Wheeler* and *Mr. A. S. Worthington* for plaintiff in error.

*Mr. John Selden* for defendant in error.  *Mr. H. B. Titus* filed a brief for same.

MR. JUSTICE WHITE delivered the opinion of the court.

The facts out of which this controversy grows are fully stated in *Hovey* v. *McDonald*, 109 U. S. 150, but we briefly reiterate those which are material to an understanding of the issues now presented.

A. R. McDonald, a British subject, obtained an award from the Mixed Commission appointed under the treaty of 1871 for the settlement of the " Alabama claims." 17 Stat. 863. Before the payment of the award, two suits in equity were commenced in the Supreme Court of the District of Columbia

against McDonald and one William White, to whom it was asserted McDonald had made a fraudulent assignment of his claim. One of the suits was by Thomas R. Phelps, who alleged that he was the owner of the claim as the assignee in bankruptcy of McDonald; the other was brought by Hovey and Dole, who claimed to be entitled to a one-fourth interest in the award in consequence of an alleged contract which they asserted they had made with McDonald entitling them to an interest, to that extent, for professional services rendered or to be rendered in the prosecution of the claim. Injunctions were issued against the collection by McDonald and White of the fund. In the Phelps suit a consent decree was entered, which was also assented to by the parties in the Hovey and Dole case, releasing one-half of the award, and authorizing G. W. Riggs, who was appointed receiver, to collect the other half and retain it to abide the result of both suits. The receiver, moreover, was directed to invest the money by him collected either in registered bonds of the United States or of the District of Columbia guaranteed by the United States.

The bills and amended bills were demurred to in each suit, and the demurrer in both cases being sustained the bills were dismissed. The decree of dismissal in the Hovey and Dole case, entered on the 24th of June, 1875, simply stated that the demurrer was sustained and the bill dismissed with costs. On the same day an appeal, without supersedeas, to the general term was noted on the minutes of the court. This decree was a few days thereafter, on the 28th of June, amended by ordering the receiver to pay over the funds in his hands and providing for his discharge. This decree was presented to the receiver, and in accordance with personal and verbal instructions given him by a judge of the court by which the decree of dismissal was rendered, the receiver delivered the bonds in his custody to McDonald. On the same day the firm of Riggs & Company, supposing that they had a perfect right so to do, purchased the bonds from McDonald at their full market value, and caused them to be transferred into their name. The decree of dismissal in the *Phelps case*, which was also appealed from, was affirmed by the general term of the

Supreme Court of the District, but that in the case of Hovey and Dole was reversed. The latter case was put at issue by filing an answer, averring fraud and wrongdoing on the part of Hovey and Dole, the answer alleging facts which, if found to be true, would have defeated a recovery by the complainants. After replication, testimony was taken at various times during the years 1875 and 1876.

In June, 1877, the complainants obtained an order from the Supreme Court of the District of Columbia at general term, requiring the defendants McDonald and White to "pay over to the registry of the court" the sum of $49,297.50, which had been paid them by the receiver. This order was disobeyed, and thereupon the complainants, in September, 1877, moved the defendants McDonald and White to show cause "why they and each of them should not be punished for disobedience of the order as for a contempt." On December 8, 1877, the Supreme Court of the District of Columbia made a decree at general term that "the rule upon the defendants to show cause why they should not be decreed to be in, and punished as for a contempt of court, etc., be made absolute, and that the said McDonald and White be taken and deemed to be in contempt of the aforesaid order," etc. Such decree further provided that "unless McDonald and White, within six days from the entry of this order, and the service of a copy thereof upon their solicitors, shall in all respects comply with the said order of June 19, 1877, and pay into the said registry of this court the sum of $49,297.50, the answer filed by them in the cause be stricken out, and that this cause proceed as if no answer therein had been interposed; and that, until the said defendants shall comply with the said order of June 19, 1877, all proceedings on the part of said defendants in this cause be and the same are hereby perpetually stayed."

On December 29, 1877, the Supreme Court of the District of Columbia at general term, on motion of the complainants, and proof of non-compliance on the part of the defendants McDonald and White with the requirements of the decree of December 8, 1877, "ordered, adjudged and decreed that the answer filed in this cause by the defendants McDonald and

White be stricken out and removed from the files of the court, and that this cause do proceed as if no answer herein had been interposed."

On February 12, 1878, the Supreme Court of the District of Columbia at general term made decree as follows:

"The answer of defendants having been removed from the files for their contempt in refusing to obey the order of court and deposit in the registry the sum of $49,297.50, it is now ordered, adjudged and decreed that the bill be taken *pro confesso* against them."

On April 17, 1878, that order was made absolute by another order or decree, which, after reciting material allegations in the complainants' bill as "standing without denial on the part of the defendants," ordered and adjudged "that the complainants have a lien upon the claim of Augustine R. McDonald against the United States . . . of $197,190, and upon any draft, money, evidence of indebtedness or proceeds thereof."

Thereafter proceedings were taken in the court by which the judgment had been awarded, to compel Riggs as receiver to account for the money which had come into his hands and which he had paid over to McDonald under the circumstances already stated. This suit culminated in a judgment in favor of Riggs, affirmed by this court in *Hovey v. McDonald, supra.*

The suit now before us was subsequently commenced in the State of New York against the surviving partners of Riggs & Company, but service was had only on one of the partners, John Elliott, and he having died, his executors were substituted as parties defendant. The object of the suit was to compel the defendants to account for the bonds or their value, upon the theory that Riggs & Company had acquired them with actual notice of the pending litigation concerning the bonds, and were bound by the result of the judgment rendered as above stated in the suit of *Hovey and Dole v. McDonald.* The Court of Appeals of New York held that the judgment was not binding upon Riggs & Company or the surviving members thereof, because, as it was rendered in a contempt proceeding after striking out the answer and refusing to consider the testimony filed in the cause, the judgment was

beyond the jurisdiction of the court, as the power of courts of the District of Columbia, to punish for contempt, was restricted by the provisions of section 725 of the Revised Statutes. 145 N. Y. 126. The New York court, moreover, held that, even assuming that the Supreme Court of the District had jurisdiction, and that the doctrine of the liability of purchasers *pendente lite* applied to a purchase made under the circumstances shown, the firm of Riggs & Company were not such purchasers with reference to the judgment in question, as the *lis* in which the judgment was rendered was not the one pending at the time of the sale to the firm. From this judgment error was prosecuted to this court upon the theory that the decision of the Court of Appeals of the State of New York denied proper faith and credit to the judgment rendered by the Supreme Court of the District of Columbia.

Whether, as held by the court below, the courts of the District of Columbia are confined in all characters of contempt only to an infliction of the penalties authorized in section 725 of the Revised Statutes, and, therefore, have not power in any other form or manner to punish for a contempt, is a question which we do not deem it necessary to decide, and as to which, therefore, we express no opinion whatever. In the view we take of the case, even conceding that the statute does not limit their authority, and hence that the courts of the District of Columbia, notwithstanding the statute, are vested with those general powers to punish for contempt which have been usually exercised by courts of equity without express statutory grant, a more fundamental question yet remains to be determined, that is, whether a court possessing plenary power to punish for contempt, unlimited by statute, has the right to summon a defendant to answer, and then after obtaining jurisdiction by the summons, refuse to allow the party summoned to answer or strike his answer from the files, suppress the testimony in his favor, and condemn him without consideration thereof and without a hearing, on the theory that he has been guilty of a contempt of court. The mere statement of this proposition would seem, in reason and conscience, to render imperative a negative answer. The funda-

mental conception of a court of justice is condemnation only after hearing. To say that courts have inherent power to deny all right to defend an action and to render decrees without any hearing whatever is, in the very nature of things, to convert the court exercising such an authority into an instrument of wrong and oppression, and hence to strip it of that attribute of justice upon which the exercise of judicial power necessarily depends.

In *McVeigh* v. *United States*, 11 Wall. 259, the court, through Mr. Justice Swayne, said (p. 267):

"In our judgment, the District Court committed a serious error in ordering the claim and answer of the respondent to be stricken from the files. As we are unanimous in this conclusion, our opinion will be confined to that subject. The order in effect denied the respondent a hearing. It is alleged that he was in the position of an alien enemy, and hence could have no *locus standi* in that forum. . . . The liability and the right are inseparable. A different result would be a blot upon our jurisprudence and civilization. We cannot hesitate or doubt on the subject. It would be contrary to the first principles of the social compact and of the right administration of justice."

And quoting with approval this language, in *Windsor* v. *McVeigh*, 93 U. S. 274, the court, speaking through Mr. Justice Field, again said (pp. 277, 278):

"The principle stated in this terse language lies at the foundation of all well-ordered systems of jurisprudence. Wherever one is assailed in his person or his property, there he may defend, for the liability and the right are inseparable. This is a principle of natural justice, recognized as such by the common intelligence and conscience of all nations. A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal.

"That there must be notice to a party of some kind, actual or constructive, to a valid judgment affecting his rights, is admitted. Until notice is given, the court has no jurisdiction

in any case to proceed to judgment, whatever its authority may be, by the law of its organization, over the subject-matter. But notice is only for the purpose of affording the party an opportunity of being heard ·upon the claim or the charges made; it is a summons to him to appear and speak, if he has anything to say, why the judgment sought should not be rendered. A denial to a party of the benefit of a notice would be in effect to deny that he is entitled to notice at all, and the sham and deceptive proceeding had better be omitted altogether. It would be like saying to a party, appear and you shall be heard; and, when he has appeared, saying, your appearance shall not be recognized, and you shall not be heard. In the present case, the District Court not only in effect said this, but immediately added a decree of condemnation, reciting that the default of all persons had been duly entered. It is difficult to speak of a decree thus rendered with moderation; it was in fact a mere arbitrary edict, clothed in the form of a judicial sentence."

This language but expresses the most elementary conception of the judicial function. At common law no man was condemned without being afforded opportunity to be heard. Thus Coke (2 Inst. p. 46), in commenting on the 29th chapter of Magna Charta, says: "No man shall be disseised, etc., unless it be by the lawful judgment; that is, verdict of his equals (that is, of men of his own condition) or by the law of the land (that is, to speak it once for all), by the due course and process of law."

Blackstone, in Book 4 of his Commentaries, at page 282, after referring to the subject of summary convictions, says:

"The process of these summary convictions, it must be owned, is extremely speedy, though the courts of common law have thrown in one check upon them, by making it necessary to summon the party accused before he is condemned. This is now held to be an indispensable requisite, though the justices long struggled against the point, forgetting that rule of natural reason expressed by Seneca:

' *Qui statuit aliquid, parte inaudita altera,*
*Æquum licet statuerit, haud æquus fuit*' :

a rule to which all municipal laws that are founded on the principles of justice have strictly conformed; the Roman law requiring a citation at the least, and our common law never suffering any fact (either civil or criminal) to be tried till it has previously compelled an appearance by the party concerned."

In *Capel* v. *Childs*, 2 Cromp. & Jer. 558, (1832) the validity of a proceeding by a bishop under an act of Parliament against a church vicar was in question. A requisition upon the vicar to do a certain act was held to be in the nature of a judgment and void, as the party had no opportunity of being heard. Lord Lyndhurst, C. B., at p. 574, said:

"A party has a right to be heard for the purpose of explaining his conduct; he has a right to call witnesses, for the purpose of removing the impression made on the mind of the bishop; he has a right to be heard in his own defence. On consideration, then, it appears to me, that, if the requisition of the bishop is to be considered a judgment, it is against every principle of justice that that judgment should be pronounced, not only without giving the party an opportunity of adducing evidence, but without giving him notice of the intention of the judge to proceed to pronounce the judgment."

In *Bonaker* v. *Evans*, 16 Q. B. 162, the main question for consideration was whether a sequestration ordered by a bishop was a proceeding simply in the nature of a distress to compel residence or altogether, or even in part *in pœnam* for previous non-residence. The court said (p. 171):

"If it be the latter, then the bishop ought to have given the incumbent an opportunity of being heard before it was issued; for no proposition can be more clearly established than that a man cannot incur the loss of liberty or property for an offence by a judicial proceeding until he has had a fair opportunity of answering the charge against him, unless indeed the legislature has expressly or impliedly given an authority to act without that necessary preliminary. This is laid down in *Bagg's case*, 11 Rep. 93*b*, 99*a*; *Rex* v. *The Chancellor &c. of the University of Cambridge* (*Dr. Bentley's case*), 1 Strange, 557; *Rex* v. *Benn*, 6 T. R. 198; *Harper* v. *Carr*,

7 T. R. 270; and *Rex* v. *Gaskin,* 8 T. R. 209; and many other cases, concluding with that of *Capel* v. *Childs,* 2 Cromp. & Jer. 558, in which Bayley, B., says he knows of no case in which you are to have a judicial proceedings, by which a man is to be deprived of any part of his property, without his having an opportunity of being heard. That case was a very strong one, and shows how firmly the court adhere to that great principle of justice, that, in every judicial proceeding, '*Qui aliquid statuerit parte inauditâ alterâ, Æquum licet statuerit non æquus fuerit.*' "

Story, in his treatise on the Constitution (vol. 2, § 1789), speaking of the clause in the Fifth Amendment, where it is declared that no person "shall be deprived of life, liberty or property, without due process of law," says:

"The other part of the clause is but an enlargement of the language of Magna Charta, '*nec super eum ibimus, nec super eum mittimus, nisi per legale judicium parium suorum, vel per legem terræ*' (neither will we pass upon him, or condemn him, but by the lawful judgment of his peers, or by the law of the land). Lord Coke says that these latter words, *per legem terræ* (by the law of the land), mean by due process of law, that is, without due presentment or indictment, and being brought into answer thereto by due process of the common law. So that this clause in effect affirms the right of trial according to the process and proceedings of the common law."

Can it be doubted that due process of law signifies a right to be heard in one's defence? If the legislative department of the government were to enact a statute conferring the right to condemn the citizen without any opportunity whatever of being heard, would it be pretended that such an enactment would not be violative of the Constitution? If this be true, as it undoubtedly is, how can it be said that the judicial department, the source and fountain of justice itself, has yet the authority to render lawful that which if done under express legislative sanction would be violative of the Constitution. If such power obtains, then the judicial department of the government sitting to uphold and enforce the Constitution is the only one possessing a power

to disregard it. If such authority exists then in consequence
of their establishment, to compel obedience to law and to
enforce justice courts possess the right to inflict the very
wrongs which they were created to prevent.

In *Galpin* v. *Page*, 18 Wall. 350, the court said (p. 368):

"It is a rule as old as the law, and never more to be re-
spected than now, that no one shall be personally bound until
he has had his day in court, by which is meant, until he has
been duly cited to appear, *and has been afforded an opportu-
nity to be heard.* Judgment without such citation and oppor-
tunity wants all the attributes of a judicial determination; it
is judicial usurpation and oppression, and can never be upheld
where justice is justly administered."

Again, in *Ex parte Wall,* 107 U. S. 265, 289, the court quoted
with approval the observations as to "due process of law"
made by Judge Cooley, in his Constitutional Limitations, at
page 353, where he says:

"Perhaps no definition is more often quoted than that given
by Mr. Webster in the *Dartmouth College case:* 'By the law
of the land is most clearly intended the general law; a law
which hears before it condemns, which proceeds upon inquiry
and renders judgment only after trial. The meaning is that
every citizen shall hold his life, liberty, property and immuni-
ties under the protection of the general rules which govern
society.'"

And that the judicial department of the government is, in
the nature of things, necessarily governed in the exercise of
its functions by the rule of due process of law, is well illus-
trated by another observation of Judge Cooley, immediately
following the language just quoted, saying: "The definition
here given is apt and suitable as applied to judicial proceed-
ings, which cannot be valid unless they 'proceed upon inquiry,'
and 'render judgment only after trial.'"

The necessary effect of the judgment of the Supreme Court
of the District of Columbia was to decree that a portion of
the award made in favor of the defendant, in other words,
his property, belonged to the complainants in the cause. The
decree therefore awarded the property of the defendant to

the complainants upon the hypothesis of fact that by contract the defendant had transferred the right in or to this property to the complainant. If the court had power to do this, by denying the right to be heard to the defendant, what plainer illustration could there be of taking property of one and giving it to another without hearing or without process of law. If the power to violate the fundamental constitutional safeguards securing property exists, and if they may be with impunity set aside by courts on the theory that they do not apply to proceedings in contempt, why will they not also apply to proceedings against the liberty of the subject? Why should not a court in a criminal proceeding deny to the accused all right to be heard on the theory that he is in contempt, and sentence him to the full penalty of the law. No distinction between the two cases can be pointed out. The one would be as flagrant a violation of the rights of the citizen as the other, the one as pointedly as the other would convert the judicial department of the government into an engine of oppression and would make it destroy great constitutional safeguards.

But the argument is that however plain may be the want of power in all other branches of the government to condemn a citizen without a hearing, both upon the elementary principles of justice and under the express language of the Constitution, these principles do not limit the power of courts to punish for contempt or as for contempt, because it is asserted that from the earliest times the Chancery Court in England has possessed and exercised the power to refuse the right to be heard to one in contempt, and that a power so well established in England, before the adoption of the Constitution and which has been so often exercised since, is not controlled by the principles of reason and justice just stated. But this contention is without solid foundation to rest upon, and is based upon a too strict and literal rendering of general language to be found in isolated passages contained in the works of writers on ancient law and practice and on loose statements as to the practice of the Court of Chancery to be found in a few decisions of English courts. Certain it is that

in all the reported decisions of the Chancery Courts in England no single case can be found where a Court of Chancery ever ordered an answer to be stricken from the files and denied to a party defendant all right of hearing because of a supposed contempt. And in the American adjudications, whilst there are two cases, one in New York and the other in Arkansas, asserting the existence of such power, an analysis of these cases and the authorities upon which they rely will conclusively show the erroneous character of the conclusions reached.

The foundation for the assertion that the power existed in and was exercised by the English Court of Chancery to strike from the files the answer of a defendant in contempt for disobedience to an order made in the cause, and to decree *pro confesso* against him, primarily rests upon what is supposed to be the true construction of one of the ordinances of Lord Bacon (promulgated in 1618), which reads as follows:

" 78. They that are in rebellion, especially as far as proclamation of rebellion, are not to be here (heard?), neither in that suit, nor in any other, except the court of special grace suspend the contempt."

What construction was given to this ordinance or the extent to which it was enforced by the Court of Chancery in the years immediately succeeding its adoption cannot be positively affirmed, as we have not found nor have we been referred to any decisions made in the seventeenth or eighteenth centuries purporting to be based upon that ordinance.

On the mere text of the ordinance, it is manifest that it does not necessarily embrace the power to enter a decree *pro confesso*, after answer filed, upon the theory that the defendant was guilty of contempt. On the contrary, the proclamation of rebellion, referred to in the ordinance, was one of the then recognized processes for the purpose of compelling an answer in the suit. Indeed, the powers of the chancery courts to punish for contempt were normally brought into play, beginning with an attachment of the person and culminating in the sequestration of the property of the one in contempt in order to compel an appearance and answer. Gilbert, For. Rom. p. 33; 3 Bl. Com. 443. Nowhere in these works is

there an intimation that, as a penalty for contempt, a refractory
defendant, not in default for answer, might be punished by
being disallowed the right to defend against the bill filed in
the cause.   So far from such being the case, as already stated,
a party who failed to appear or answer was treated as in con-
tempt, and the various processes for contempt were resorted
to in order to compel his appearance and answer; this being
done in order that the conscience of the court might be satis-
fied when it entered a decree in the cause.

Thus in the Forum Romanum, Lord Chief Baron Gilbert
says (p. 35):

"The canonists do take the proclamation or *primum de-*
*cretum* to be *quasi litis contestatio ;* and, therefore, the plaintiff
may proceed to his proofs, and then the *secundum decretum*
for the thing in demand may be pronounced.   We have no
*quasi litis contestatio* with us, because, unless the defendant
comes in and contests there is no jurisdiction to a court of
conscience; for unless the party confesses the fraud or corrup-
tion of which the court inquires, or it be proved upon him,
there is no sufficient ground for a decree, which cannot be
without *contestatio litis.*

"But there are two cases in which an implied confession is
a sufficient ground for a decree.

"The first is, when a man appears by his clerk in court, and
afterwards lies in prison, and is brought up three times to
court by *ha. cor.*, and has the bill read to him, and he refuses
to answer.   Such public refusal in court does amount to the
confession of the whole bill.

"The second case is, when a person appears and departs
without answering, and the whole process of the court has
been awarded against him after his appearance and departure,
to the sequestration.   There also the bill is taken *pro confesso,*
because it is presumed to be true when he has appeared, and
departs in spite of the court, and withstands all its process
without answering; and this seems to have been the ancient
practice of the civil law, for Justinian, by the Novel, brought
in the *secundum decretum* in the absence of the party; and
the canonists, by a fiction of law, made the proclamation *quasi*

*litis contestatio ;* but by the ancient civil law no decree could be had against an absent person against whom process had been issued, but could never be brought in to appear. And it is so with us, that if the whole process of the court be spent, and the defendant never appears, you can never have a decree, for you can never make any proofs against an absent person who is never brought into contest, and there is no foundation for a decree without confession or proofs. However, the plaintiff has the benefit of the sequestration, which answers to the *primum decretum.*"

While by act 5 Geo. II, c. 25, for want of appearance, when a defendant avoided service of process, the court was authorized, after the giving of prescribed public notice, to order the plaintiff's bill to be taken *pro confesso, Davis* v. *Davis,* 2 Atk. 21, 23, the text quoted is convincing evidence that a decree was only permissible in the " court of conscience " under a state of facts which justified the implication of an admission by the defendant that the allegations of the bill were true, and that the practice was not pursued as a punishment for any other contempt than of contumaciously refusing to inform the chancellor of the defence, if any, possessed by the defendant in a cause.

In stating the practice with reference to injunction suits, several of the ancient writers use general language as to the practice pursued when a party disobeyed an injunction, which, perhaps, affords room for speculation as to the extent to which the court *might* have proceeded in refusing to hear a party who had violated its order and had not purged his contempt. Thus, in the Practical Register in Chancery, p. 217, it is said:

" Where an Injunction is disobeyed, on Oath thereof, Process of Contempt is to issue against the Contemnor, as in other Cases, till he yield Obedience ; nor is he to be heard in the principal Case, till he yield Obedience."

Comyn, in his Digest (Chancery, D. 8), thus puts it:

" And if, after service (of an injunction), it shall be disobeyed, all process for contempt issues, till the offender be taken and committed upon an *affidavit* of his disobedience. Vide Pract. Reg. in Chan. 217.

"And when he is taken he shall be committed, until he obeys, or gives security for his obedience, and shall not be heard in the principal case, until he obey."    Ib.

Whether in early chancery times the practice was to stay all proceedings on the part of a disobedient party defendant until his contempt of an injunction was purged, can only be surmised. In 1788 it seems that a defendant, though in contempt for violating an injunction, might file his answer in the cause. *Robinson* v. *Lord Byron*, 2 Dick. 703. It is not at all unlikely that the restriction was upon the party coming before the court by way of motion seeking affirmative action by the court in his favor.   It is certain that neither in the Register nor in Comyns is there a suggestion that a party, while in contempt for disobedience of an injunction, might, *for such cause*, be defaulted upon the merits.

The Forum Romanum makes no reference to the rule or method of practice stated in the Register, otherwise than as may be inferred from the statements in paragraph 11, p. 194, where the author mentions that by the proceeding then in vogue for punishing for breach of an injunction "a man is at once deprived of his liberty, and cannot move or petition but *in vinculis*, unless the court otherwise give leave on a petition to hear him."

The review and analysis of the English cases which we now propose to make will demonstrate that the passages to which we have just referred could not have imported the power of a court to strike an answer from the files and take a bill for confessed because of a contempt, since that analysis will conclusively establish that there is no basis for the assertion that the Courts of Chancery in England claimed or exercised the power, after answer filed, to decree *pro confesso* on the merits against a defendant, merely because he persisted in disobedience to an order of the court, though the cases do show that the Chancery Courts commonly refused to hear a defendant in contempt when asking at their hands a favor.   The difference between the want of power, on the one hand, to refuse to one in contempt the right to defend in the principal case on the merits, and the existence of the authority, on the other, to refuse to

accord a favor to one in contempt, is clearly illustrated by the whole line of adjudicated cases.

The cases of *Phillips* v. *Bucks*, (*Duke*) 1 Vern. 227, (1683); *Roper* v. *Roper*, 2 Vern. 91, (1688); and *Maynard* v. *Pomfret*, 3 Atk. 468, (1746) do not discuss the ordinance of Lord Bacon, but touch upon the question of the right of a defendant in contempt to be heard. In the first case cited, the reporter, in a marginal note, alluding to a defendant who was in contempt *for failure to appear or answer*, says: " One of the defendants is in contempt and stands out to a sequestration and the cause is heard against the other defendants; yet he may come in and answer, and the cause may be heard again as to him." In *Roper* v. *Roper*, upon a decree for payment of money, after a writ of execution and an attachment returned, the court declined to give leave to defendant to be examined, unless he gave security to abide the decree. This was clearly an application addressed to the discretion of the court, and therefore a matter of favor.

In *Maynard* v. *Pomfret*, a bill was brought against the defendant for a discovery. As the material part of the case depended upon the discovery, the defendant would not answer, but stood out the whole process of contempt to a sequestration, and the bill was taken *pro confesso*, and there was a decree against the defendant *ad computandum*. It was moved, on behalf of the defendant, that the sequestration may be discharged on paying the costs of the contempt. The chancellor regarded action upon the application as discretionary, and held that the sequestration should be kept on foot to stand as security for the appearance of the defendant before the master.

That in the time of Lord Clarendon the practice of the Court of Chancery was only to deny to a party in contempt the privilege of having favorable action taken by the court upon applications addressed to its discretion finds support, not only in the case of *Phillips* v. *Bucks*, *supra*, but also in a decision of Sir H. Grimston, Master of the Rolls, who, in refusing an application for relief against a sequestration of lands of the defendant following a decree, assigned, among other reasons,

the following: "2dly the defendant not having performed the decree by the payment of the money, he shall not receive any favour from the court whilst he stands in contempt." Bacon's Abridgment, Sequestration, C., the marginal reference being to a case entitled *Sands* v. *Darrell.*

*Vowles* v. *Young*, 9 Ves. 172, (1803) was likewise an application to the favor of the court. A decree absolute had been entered after a decree *nisi*, against a defendant who was in default, and consequently in contempt. He applied for a rehearing, and in the course of an opinion granting the application upon terms, Lord Eldon said, not citing authority: "As to the contempt, the general rule is, that the parties must clear their contempt before they can be heard." The language of the chancellor necessarily related to the question before it, that is, an application for a rehearing addressed to the exercise of discretion. Stating the *general* and not the *invariable* rule, implied the possible existence of exceptions to such rule.

*Anonymous*, 15 Ves. 174, (1808) was a case where the defendant, being in default for not answering, filed an answer without making any stipulation for the payment of costs, and also moved to dismiss the bill for want of prosecution. Upon the authority of the passage in *Vowles* v. *Young*, just quoted, counsel for the complainant objected that the defendant could not make the motion or take any step to the prejudice of the plaintiff, until the contempt was discharged. The Lord Chancellor said: "The general rule, that has been referred to, is perfectly true; that a party, who has not cleared his contempt, cannot be heard." The plaintiff, however, was held to have waived the right to treat the defendant as being in contempt, because he had excepted and replied to the answer without insisting upon the costs and enforcing his process of contempt. Presumably, the general rule here referred to was that to which we have already adverted, viz., the power of a chancellor to refuse to grant a favor to one in contempt. The facts brought the case under this rule, since the defendant who was in contempt for not paying the costs, on filing his answer, sought to invoke the aid of the court to dismiss the plaintiff's bill for failure to prosecute the suit.

*Heyn* v. *Heyn*, Jacob, 49, decided in 1821, was a case where, after a decree *pro confesso* upon default for answer, the defendant moved that a sequestration which had been issued against his property for not putting in his answer might be discharged upon payment of costs, and that he might be allowed to attend the master upon the taking of the accounts directed by the decree. The Lord Chancellor observed that an answer which had been put in after an order for taking the bill *pro confesso* ought not to be noticed, and that it could not vary the decree which had been rendered. He, however, granted the application upon conditions, being of opinion that the defendant was not at liberty to go before the master without an order. The mere statement of this case demonstrates that it involved purely a question of whether the chancellor would accord to the defendant a favor or privilege.

In *Clark* v. *Dew*, 1 Russ. & M. 103, (1829) the plaintiff applied for the appointment of a receiver, and it was objected by the defendants that, as the plaintiff was in contempt of court for disobeying certain orders in another cause pending between the same parties, he ought not to be heard in this. All that was said by the Lord Chancellor on the subject under review was as follows:

"That the practice was the same, he apprehended, in equity as at law, that a party could not move, till he cleared his contempt; but that the rule must be confined to proceedings in the same cause; otherwise, the consequence would be that a party, who was utterly unable to comply with an order of the court, might be prevented from afterwards prosecuting any claims, however just, against the person who had succeeded in obtaining that order. Here the suit was between the same parties, but it had reference to distinct properties."

It will be seen that this conflicts with the literal language of Lord Bacon's ordinance, which was that a party should not be heard "neither in that suit, *nor any other*," etc.

Several decisions of the Rolls Court in Ireland bearing upon the question are contained in the first volume of Hogan's Reports.

Thus, in *Anon.* v. *Lord Gort*, p. 77, (1823) a receiver was

moved for on process against the defendant, who opposed the application. Counsel for plaintiff insisted that, as the defendant was in contempt, he should not be heard unless he purged his contempt, citing *Vowles* v. *Young, supra.* The Master of the Rolls said:

"The general rule is, that when a party is in contempt, he will not be allowed to oppose the relief sought by the plaintiff, by contradicting the allegations in his bill, or bringing forward any defence, or alleging new facts, neither will he be heard by affidavit, except it be made with a view of purging his contempt, but he may be heard to direct the attention of the court to any error or insufficiency in the plaintiff's own case, as made by the bill, as for example, if it should appear by the bill that plaintiff's charge only extends over Whiteacre, and the plaintiff, by motion, sought a receiver over Blackacre."

The application for a receiver would seem to have been one of the steps in the process of punishment for contempt for not answering. Thus, in the case of *Fitzpatrick* v. *Hawkshaw,* Ib. p. 82, a motion was made for the appointment of a receiver on process against the defendant, and in the marginal note it is said: "A defendant who has appeared, but is in contempt for not answering, is entitled to notice of a motion for a receiver on process."

A further indication that the rule was not understood to operate to deny to a defendant a hearing upon matters of strict right is shown by the case of *Cooke* v. *De Montmorency,* 1 Hogan, 181, where it was held that though a party was in contempt, he might notwithstanding apply for and obtain time to answer the bill, and an order on the plaintiff to stay the entry of process in the meantime.

In the case of *Valle* v. *O'Reilly,* 1 Hogan, 199, complainant moved for the appointment of a receiver on process against the defendant, on an affidavit stating that the bill was filed to raise the arrears of an annuity which was still due. The contempt would seem to have consisted in failure to answer. After observing that the estate was in the possession of a receiver in another cause, the Master of the Rolls said:

"As this defendant is in contempt, he cannot be heard to

dispute or deny the plaintiff's case, as disclosed by his bill; but he may be heard to point out the irregularity or impropriety of any application made by his antagonist. I must refuse this motion and give the defendants the cost of appearing here this day."

The cases of *Howard* v. *Newman*, 1 Moll. 221, and *Odell* v. *Hart*, 1 Moll. 492, were decided by the Lord Chancellor in 1828. In *Howard* v. *Newman* a rule to refer the bill for impertinence was obtained by the defendant, against whom there was process *for want of an answer*. The rule was discharged, the Lord Chancellor saying : "A party in contempt is not to be heard until his contempt is cleared, except only to complain that he is irregularly put in contempt, and ought not to be so. He is precluded from applying for any order of any kind." Of course refusal to allow a party to move until he has answered, and when he was in default for not answering, cannot possibly be construed as supporting the contention that when a defendant had regularly answered his answer might be stricken from the files, and the case be decided as though no answer had ever been filed.

In *Odell* v. *Hart* a motion was made on behalf of the defendant to set aside as irregular an order which awarded an attachment absolute (instead of conditional) in the first instance against him for not bringing in title deeds according to a previous order. It was objected that the defendant, being *de facto* in contempt, ought to appear *in vinculis*, citing *Vowles* v. *Young*, 9 Ves. 172.

The Lord Chancellor said :

"A party in contempt may move by counsel to set aside the order against him, by which he is declared to be in contempt, for irregularity in that order, without coming *in vinculis*, but for no other purpose, without submitting himself to custody."

In other words, the party in contempt, when not in custody cannot *apply to the court for an order* except to set aside for irregularity the order adjudging him guilty of contempt.

In *Ricketts* v. *Mornington*, 7 Sim. 200, decided in 1834, we find the first adjudicated case directly referring to the seventy-eighth ordinance of Lord Bacon. On the authority of the

ordinance and the case of *Vowles* v. *Young, supra*, defendant objected to the cause being heard, on the ground that the plaintiff was in contempt for disobedience of an order in the case. The opinion rendered by the vice chancellor is as follows:

" Suppose the Defendant had moved to dismiss the Bill, the Plaintiff, notwithstanding he was in Contempt, might have come forward and assigned reasons why his Bill should not be dismissed.

"Lord Bacon's Order, as administered in Practice, is confined to Cases where Parties who are in Contempt come forward, voluntarily, and ask for Indulgences. But the Rules of the Court make it imperative on the Plaintiff to bring his Cause to a Hearing at a certain time; and, therefore, the Cause must proceed."

*Barker* v. *Dawson* and *Parry* v. *Perryman* were decided, respectively, in 1836 and 1838, and are reported in 1 Coop. Ch. C. 207. The general rule was stated to be that a party in contempt could not be heard on other matters, but it was held that there were exceptions to it, as where an order which was alleged to be irregular was obtained subsequent to a contempt, and it was sought to set it aside for irregularity, and " where the party in contempt was merely protecting himself," in both of which cases the rule was held not to apply. The Lord Chancellor said that to extend the rule to the case of an order made subsequent to the contempt " would place the party in contempt too much at the mercy of his adversary."

*King* v. *Bryant*, 3 M. & C. 191, (1838) was a foreclosure suit, in which the defendant, after appearance, was in contempt for want of an answer and was imprisoned under attachment. A decree was subsequently taken *pro confesso* ordering an account, and the proceedings before the master were had *ex parte* without notice to the defendant. An application was made by the defendant praying that the order confirming the report of the master might be discharged, and that it might be referred back to the master to review his report. An objection made before the vice chancellor was renewed on appeal, viz.,

that the defendant was not entitled to be heard, because in contempt. The Lord Chancellor, however, decided that the defendant was entitled to be heard to show that the plaintiff had been irregular in his mode of prosecuting the decree, and also said (p. 195):

"If the plaintiff ought to have served warrants on the defendant (to attend before the master) and if he ought to have served him with the order *nisi*, it would be a most unjust extension of the rule against parties in contempt, to take away a man's estate without giving him any opportunity of coming in and protecting himself.

"The court will not hear a party in contempt coming himself into court to take any advantage of proceedings in the cause; but such a party is entitled to appear, notwithstanding, and resist any proceedings taken against him, and it would be a very easy way of evading that rule if his adversary, instead of giving him notice, were to avoid serving him, and then to say that he could not take advantage of the rule in order to impeach the previous proceedings. However there is no such practice.

\*          \*          \*          \*          \*

"The court punishes the defendant's default in refusing to answer, by giving to the plaintiff the benefit of a decree upon the bill as confessed; but there the advantage stops, and when the decree is once pronounced, the subsequent duty of the court and its officers is to execute that decree in the ordinary way. Accordingly, no authority is to be found in support of the proposition that, upon a decree taking the bill *pro confesso*, and directing an account, the account may be prosecuted *ex parte*. The case of *Dominicetti* v. *Latti* shows that, in the year 1781, the practice was considered to be directly otherwise. . . .

"The plaintiff here has miscarried. He has proceeded *ex parte*, when he ought to have proceeded by warrants, and the present application is to protect the defendant against an order for a foreclosure, obtained upon an irregular report, which can only be considered as a nullity." . . .

In *Wilson* v. *Bates*, 3 M. & C. 197, the plaintiff, while in

contempt and in the custody of the sheriff for failure to pay the costs of a motion, sued out an attachment against the defendants for want of an answer, under which the defendants were arrested and thereupon entered into bail bonds. The vice chancellor having refused a motion, on behalf of the defendants, that the attachments against them might be set aside, and that the bail bonds might be ordered to be cancelled, the motion was renewed before the Lord Chancellor, by way of appeal. Counsel for defendants contended that the proceedings of the plaintiff were irregular because a party in contempt could not take any proceedings in the cause, and cited the seventy-eighth ordinance of Lord Bacon and *Vowles* v. *Young, supra.* Counsel for plaintiff characterized the proposition that a plaintiff could not take any step in a cause for the reason that an attachment had issued for non-payment of costs, "as new, and if established, would be a *dangerous extension* of the ordinary rule with respect to parties in contempt." The Lord Chancellor, after alluding to the fact that *no case upon the point had been produced,* and that the argument was mainly grounded upon the seventy-eighth ordinance of Lord Bacon, said (p. 200):

"That ordinance, although the foundation of the practice, can only be construed now by the practice which has since prevailed with reference to it. It is quite obvious that its terms, if strictly acted upon, would produce a very different state of practice from that which is recognized in modern times. If I had to decide upon that in the first instance, and were called upon to settle a rule for future guidance, I certainly never should lay down any such rule. It would seem extraordinary that a party, who may not be able to pay the costs of a refused motion, should be therefore absolutely stopped from asserting his rights. At the same time, if the practice be established, it would not be for me to alter it. Now, although it may be generally true that a party in contempt cannot be heard to make a motion, he is nevertheless permitted to be heard upon a motion to get rid of that contempt, a case for which, so far as I can see, Lord Bacon's ordinance makes no provision. It is also well settled, that if a party in con-

tempt is brought into court by any proceedings taken against him, he has a right to be heard in his defence, and in opposition to those proceedings; another case which is inconsistent with Lord Bacon's ordinance, if construed strictly."

The conclusion was reached that there was an absence of all authority to sustain the proposition contended for, and that the vice chancellor was right in permitting the plaintiff to proceed in the cause.

In *Bickford* v. *Skewes*, 10 Sim. 193, (1839) plaintiff moved to defer the trial of a cause until the defendant had cleared himself of a contempt. The vice chancellor said (p. 196):

" The motion now before me is one of the first impression. A party who is in contempt may, at any time, clear his contempt. At the time the Lord Chancellor's order was made, the defendant was not in contempt. That order is still in full force, and I cannot understand how the circumstance that the defendant had subsequently come in contempt can give to the plaintiff the right to postpone the trial of this action, which, to a certain extent, he is under an obligation to try. The defendant may, perhaps, clear his contempt before the trial, but whatever may be the circumstances of the defendant, the order of the court may remain as it is. Although the cases cited afford some countenance for this application, I cannot think that they warrant it, and therefore I shall refuse the motion without costs."

Here it appears that the defendant, though in contempt, was conceded to be entitled to participate in the trial of the cause.

In *Everett* v. *Prythergch*, 12 Sim. 363, (1841) it was held that a defendant, though himself in contempt for want of answer, might except to the bill for scandal, but not for impertinence.

In *Cattell* v. *Simons*, 5 Beav. 396, it was held that it was competent for a plaintiff, though in contempt, to refer for scandal and impertinence an affidavit filed on the part of the defendant in opposition to a motion filed by the plaintiff, while he was in contempt for non-payment of costs, asking that costs be set off between the parties. The Master of the

Rolls said that the motion was one which the plaintiff was clearly entitled to make, being an application for relief against the process of attachment.

In *Morrison* v. *Morrison*, 4 Hare, 590, (1844) it was held that a party in contempt for non-payment of costs, and who had been served with an order *nisi* to confirm a report, might, notwithstanding his contempt, take exceptions to the report, and draw up, pass, and enter an order to set down the exceptions; and might also present and be heard upon his petition to discharge the report as irregular, and for leave to open the accounts allowed in former reports, on the ground that items therein were allowed in the absence of the petitioner and while the suit was abated. A motion to discharge the order setting down the exceptions, and that the exceptions might be taken off the files, was made upon the ground that a party in contempt cannot take any active step in the cause until he had cleared his contempt. Counsel in opposition to the motion contended that the steps taken by the defendant were purely defensive, and characterized as "most extravagant" the proposition "that a party who was unable to pay a sum for costs should be precluded from taking any step in a cause, while his adversary might proceed, and his entire rights on the subject of the suit be concluded without allowing him to be heard." The vice chancellor held (p. 594) that —

"What the petitioner is in truth doing, is seeking to protect himself against the proceedings which have been taken in the cause; and the cases of *Wilson* v. *Bates* and *King* v. *Bryant* show that, in such a case, the being in contempt will not now prevent, *if it ever would have prevented*, the party from applying to the court."

In *Oldfield* v. *Cobbett*, 1 Phillips Ch. 613, (1845) it was held, among other things, that a party who is in contempt for non-payment of costs in the suit, is not thereby prevented from moving for leave to defend it *in forma pauperis*.

*Chuck* v. *Cremer*, 1 Coop. Ch. C. 205, was decided in 1846. A defendant having unsuccessfully sought to dissolve an injunction obtained *ex parte*, gave notice of motion by way of appeal. It was objected that the defendant could not be

heard, because previously to the giving of notice an attachment had issued against him, when abroad, for not having put in an answer. The decision upon this objection is thus reported:

"The Lord Chancellor said he was of opinion that the appeal motion could not proceed. That a party was entitled to be heard, if his object was to get rid of the order or other proceeding, which placed him in contempt, and he was also entitled to be heard for the purpose of resisting or setting aside for irregularity any proceedings subsequent to his contempt; but he was not generally entitled to take a proceeding in the cause for his own benefit. That there were exceptions to the last rule, but they were few in number."

In *Futvoye* v. *Kennard*, 2 Giff. 110, (1860) the plaintiff moved to discharge an order in the cause, and the defendants took the preliminary objection that the plaintiff being in contempt for the non-payment of the costs of a motion, which had been refused with costs, could only be heard to purge his contempt. On the intimation of the vice chancellor that he thought the objection could not be maintained, the objection was not pressed, and the motion was heard and refused.

In *Fry* v. *Ernest*, 12 Weekly Reporter, 97, (1863) a bill was filed by mortgagees for the purpose of enforcing their security. The defendant put in his answer and also filed a bill in the cause of *Ernest* v. *Partridge* (to which Fry and several others were made defendants) for the purpose, among other things, of setting aside the mortgage security. A demurrer being allowed to this bill, Ernest afterwards filed in *Fry* v. *Ernest* a concise statement, containing in substance the same averments as those in *Ernest* v. *Partridge*, and exhibited interrogations for the examination of the plaintiff Fry. Upon a summons taken out by the plaintiff the chief clerk made an order enlarging the plaintiff's time to answer the interrogatories for one month, after payment by the defendant of the costs of the demurrer in *Ernest* v. *Partridge*. Counsel for the plaintiff contended that the concise statement must be treated merely as a cross bill, and that the defendant could not be allowed to harass the plaintiff with a second cross bill until he had paid the costs of the first.

"Wood, V. C., said that, according to the general rule, a defendant, though in contempt, was at liberty to take every step necessary for his defence. He looked upon this mode of proceeding as of a nature purely defensive, and the defendant was therefore entitled to file a concise statement and interrogatories, which were material for his defence, and the plaintiff must answer within the usual time. The order of the chief clerk would be discharged with costs ; such costs, however, as the defendant was in default for his former costs, were not to be paid to him."

In *Haldane* v. *Eckford*, L. R. 7 Eq. 425, (1869) it was held that although a defendant is in contempt, not for non-payment of costs, but for non-compliance with orders of the court, he is entitled to take any step required for the purposes of his defence. The report of the case (p. 426) reads as follows:

"The vice chancellor said that although the contempts committed have been of the most flagrant kind, as these documents were required by the defendants for the purposes of defending themselves, *he had no jurisdiction to refuse the order.*"

In *Chatterton* v. *Thomas*, 36 L. J, Ch. 592, (1886) a plaintiff 'in contempt was held to be at liberty to proceed with the cause in the ordinary way ; and a special order for leave to amend was granted to him.

Other decisions illustrating the general rule that a party in contempt cannot be heard to ask a favor are digested by Chitty in his Equity Index, vol. 5, p. 4366, but it is unnecessary to particularly refer to them, as none of them are relied on in argument or change the result of the foregoing cases.

It is manifest from this review of the English cases that they lend no support whatever to the claim that the English Court of Chancery claimed to exercise the power to strike out an answer and render a decree *pro confesso*, as a punishment for contempt. It also clearly establishes that the seventy-eighth ordinance of Lord Bacon was never construed or enforced according to its strict import, if under that import it authorized the conclusion that a power existed in a Court of Chancery to condemn without a hearing.

The conclusion which we have reached accords with that of Daniell, who in his Chancery Pleadings and Practice (vol. 1, pp. *504, *505) says: .

"Besides the personal and pecuniary inconvenience to which a party subjects himself by a contempt of the ordinary process of the court, he places himself in this further predicament, viz.: That of not being in a situation to be heard, in any application which he may be desirous of making to the court. Lord Chief Baron Gilbert lays it down, that 'upon this head it is to be observed, as a general rule, that the contemnor, who is in contempt, is never to be heard, by motion or otherwise, till he has cleared his contempt, and paid the costs; as, for example, if he comes to move for anything, or desires any favor of the court. . . .'

"The rule, that a party in contempt cannot move till he has cleared his contempt, is, in practice, confined to cases where such party comes forward voluntarily and asks for an indulgence; and, therefore, a defendant cannot object to a cause being heard because the plaintiff is in contempt. So a defendant in contempt is entitled to production of documents."

The learned author nowhere suggests in his treatise that under any conceivable circumstance has a Court of Chancery in England ever allowed a decree *pro confesso* to be taken, otherwise than upon default for appearance for answer. See chap. 11, p. *517, " On Taking Bills *Pro Confesso.*"

The decisions in this country, with two exceptions, which we have, in the outset, referred to, substantially maintain the view we have reached of the question under consideration. An early case holding the correct rule, viz., that a party in contempt was not entitled to be heard upon an application not of strict right, but a matter of mere favor, is *Johnson* v. *Pinney*, 1 Paige, 646, decided in 1829. In that case, after an order had been entered closing the proofs, the defendant applied for a commission to take the testimony of a witness. Objection was made that the defendant was in contempt for not paying a bill of costs on a motion previously made by him to dissolve an injunction in the suit. In granting the application, upon terms, the chancellor said: " It is a general

rule that a party cannot apply to the court for a favor while he is in contempt. *Vowles* v. *Young*, 9 Ves. 172; Prac. Reg. 138; *Green* v. *Thompson*, 1 Sim. & Stu. 121." The doctrine of this decision was adopted by the Supreme Court of New Hampshire in 46 N. H. 38 (1865).

In 1846, in *Ellingwood* v. *Stevenson*, 4 Sandf. Ch. 366, the bill having been taken *pro confesso* when the defendant was in default for not answering, a motion was made to open the default and for other relief. The vice chancellor said (p. 368):

"3. The motion to open the default for not answering would be granted upon terms, but for the contempt for which the attachment is ordered. His application is made to the favor of the court, and he cannot be heard until his contempt be purged. Gilbert For. Rom. 102; 1 Daniell, 655; *Johnson* v. *Pinney*, 1 Paige, 646."

In *Brinkley* v. *Brinkley*, 47 N. Y. 40, 49, after reviewing the authorities, it was held that a court which has control of its own proceedings, can refuse the benefit of them to the party in contempt, *when asked as a favor*, and can prevent him from taking any progressive proceedings against his adversary, but it has no power to stay him in his proceedings by motion or appeal, where the object is to rid himself of the alleged contempt, or show that the order which he did not obey was erroneous. While the order reviewed provided that unless the defendant complied with a certain order his answer should be stricken out and the cause should proceed as though there was no answer, the reviewing court held that the order in this particular was conditional and not final and absolute, and was, therefore, not appealable.

However, in the case of *Walker* v. *Walker*, 82 N. Y. 260, the Court of Appeals of New York declared that the rule was broader than that laid down in *Brinkley* v. *Brinkley*, and maintained also *that it had been enforced with much rigor by the English courts*, and concluded its consideration of the subject by saying: "That there has long been exerted by the Court of Chancery in England the power to refuse to hear the defendant when he was in contempt of the court by disobeying its orders, and that that power was in the courts of

chancery of this country." The expression "the power to refuse to hear the defendant" was manifestly intended to be understood as meaning that a court of equity might disregard any answer lawfully filed by the defendant and proceed to adjudicate upon the claim of the adversary party as though in contempt for want of answer. In the case before the court the answer of a defendant in a divorce suit had been stricken from the files for failure to obey an order to pay alimony and counsel fees, though a decree was not granted as a matter of course, but a reference had been directed to take proof of the facts stated in the complaint. Immediately after stating that the rule was broader than that laid down in the *Brinkley case*, the learned judge who delivered the opinion of the court said (p. 262):

" Chief Baron Gilbert lays it down in his Forum Romanum (p. 33) that 'if the defendant appeared before the *secundum decretum*, he was liable to a mulct, for he could not be heard in the cause till he had cleared his contempt.' . . . It is suggested in Cooper's Cases (temp. Cott. 209) that this is merely a statement of the practice according to the canon law. But the Chief Baron says at another place (p. 71) that 'the answer will not be received without clearing his contempt'; and at another (p. 211): 'So it is where a man hath a bill depending in court and falls under the displeasure of the court and is ordered to stand committed. Here, when his cause is called, if the other side insist that he hath not cleared his contempt, nor actually surrendered his body to the warden of the Fleet, he must do both these things before his cause can be proceeded in. . . . "

The statement in the opinion as to the practice of the Court of Chancery in England does not, as we have shown, accord with the authorities, and it is equally clear that the citation from the work of Baron Gilbert does not justify the conclusion for which it was cited. This is abundantly shown by the citations we have made from the work of Baron Gilbert, confirmed by an analysis of the passages quoted. Thus the extract from page 33 is from a chapter which is devoted to a comparison of the practice under the civil and canon law

with that of the English Court of Chancery in the particular of compelling an appearance and answer by a defendant to a bill, and the particular extract cited was a statement of the canon law. The *secundum decretum* or second decree was the last step in the process employed to compel an appearance in the cause, and only issued at a time when the defendant was in default and could not file his answer except by leave of the court.

So, the statement that "the answer will not be received without clearing his contempt" was made in the course of a consideration of the various processes that follow the filing of the bill, designed to secure an appearance and answer of the defendant. The author had previously observed that where an attachment by proclamation (one of the steps in the process to compel an appearance and answer) had issued the defendant could not, as of course, purge his contempt by a mere tender, and had also remarked that by the very fact of an attachment he was required to answer, and also clear his contempt at the same time, adding:

"But the usual way is not to take the penalty, which is no more than for the clearing his contempt, till he hath answered. For when the penal sum is received, the defendant may reasonably say that the fault is purged, and so there would be no sufficient foundation to retain the party or carry on the process, in case he will not answer; and, therefore, the usual way is for the plaintiff to insist that the defendant should answer; but the answer will not be received without clearing his contempts."

The case spoken of was one where the defendant was in actual custody, liable to be coerced into paying the costs of the contempt.

The extract from page 211 had reference to the case of a *plaintiff*, and was in effect merely a declaration that the court might stay the proceedings in the cause until the contempt was purged.

Indeed, there is nowhere in the Forum Romanum anything suggestive of the existence of a practice in the English Court of Chancery in accord with the power which the New York

court mistakenly considered as always exercised by that tribunal.

It needs, however, no critical review of the passage from Baron Gilbert cited by the New York court to establish that the construction put upon it was a mistaken one, for Baron Gilbert leaves no doubt in another passage not cited by the New York court that the opinion attributed to him by the New York court was unfounded. At page 102 of the Forum Romanum, speaking of the steps usually taken to compel a further answer where the answer of a defendant had been held insufficient, he said:

"And upon this head it is to be observed, as a general rule, that the contemner who is in contempt is never to be heard, by motion or otherwise, till he hath cleared his contempt and paid the costs. As, for example, *if he comes to move for anything, or desires any favor of the court*, if the other side says or insists he is in contempt, though it is but an attachment for want of an answer, which, if not executed, is only ten shillings, and if executed, is twelve shillings and six pence, yet even in this case he is not entitled to be heard till he hath paid these costs (however small they are). He must first pay them to the party or his clerk in court, and produce a receipt for them in open court, before he can be heard; and this is always allowed as a good cause against hearing of the contemner in any case whatsoever."

The English authorities cited by the New York court to support its conclusion are: *Maynard* v. *Pomfret*, *Vowles* v. *Young*, *Heyn* v. *Heyn*, *Clark* v. *Dew*, *Anon.* v. *Lord Gort*, and *Valle* v. *O'Reilly*, *supra.* The review we have made of these cases does not, as we have already stated, induce us to regard them as sustaining the doctrine of the New York decision.

Nor is the opinion expressed in the *Walker case* supported by the American cases to which reference is made therein, viz.: *Mussina* v. *Bartlett*, 17 Alabama (8 Porter), 277; *Rutherford* v. *Metcalf*, 5 Hayw. (Tenn.) 58, 61; and *Saylor* v. *Mockbie*, 9 Iowa, 209, 212.

*Mussina* v. *Bartlett*, decided in 1839, was a case where the defendant was in default for answer, and he was held inca-

pacitated thereby from appearing to contest the complainant's demand before the clerk and master to whom after decree *pro confesso* the bill had been referred to take an account.

*Rutherford* v. *Metcalf*, 5 Hayw. (Tenn.) 58, 61, was a case where, on a hearing upon a proceeding to punish for breach of an injunction, an answer of one of the defendants in the cause, not a party to the contempt proceeding, was offered, but the court refused to receive it, on the ground that whether the injunction was rightfully issued or not, the defendant should submit to it until he had procured a dissolution of the injunction. In the course of the opinion, in stating the practice upon proceedings for contempt, the court said — though the question was not before it for decision — that after a party had been found guilty of contempt, "He must stand committed and pay the costs; and then he cannot be heard in the principal cause until he has yielded obedience to the injunction." The authority for the latter statement were the passages in Practical Register and Comyn's Digest, already alluded to.

*Saylor* v. *Mockbie* was decided in 1859, and was a case where the application was to the favor of the court. The defendant, *being in default for answer*, also violated an injunction which had been granted in the cause, and, on an attachment being issued, he was brought into court, filed his answer to the bill and to the rule granted against him, and moved to dissolve the injunction. The court, after observing that throughout the whole of the proceedings complained of the defendant was in default, held that until he had purged himself of the contempt in disobeying the rule of the court, the court might well refuse to receive his answer to the bill (which was only entitled to be filed as a matter of favor) or consider the matters therein set up by way of excuse for his refusal to obey the order.

It is then manifest that the decision in *Walker* v. *Walker* finds no support in the authorities upon which it is based. It was accepted, however, without any review of the authorities in *Pickett* v. *Ferguson*, 45 Arkansas, 177, 191, (1885) as correctly stating the law on the subject, though both the

trial court and the reviewing court shrank from enforcing the
doctrine to its logical consequences, as though the complaint
of a plaintiff in contempt was removed from the files, and he
was denied the right to answer a cross bill, in determining
the questions presented by the cross bill, the trial court con-
sidered the evidence which had been taken in the case before
it and in another cause, supposed to embody all the material
facts upon which the rights of the parties depended. The
reviewing court also held that if the complainant below had
been prejudiced by the action of the trial court, the record
furnished the means of correcting the error, and after a con-
sideration of the whole record, ordered a personal judgment
in favor of the complainant for a large amount.

*Hazard* v. *Durant*, 11 R. I. 195, has in one instance been
referred to as a case where the court was much perplexed
over the proper decision of a like question, and had declined
to definitely decide it. That case was one where a party in
contempt for violating an injunction was also in default for
answer, and a decree *pro confesso* had been taken. He was,
however, held entitled to take such steps in the cause as were
matters of strict right; and while refusing an application of
the petitioner to be let in to defend, the reviewing court held
that it did not follow that the suit was to be abandoned to
the plaintiffs, and, as the defendant denied the truth of the
averments in the bill, the question was reserved as to whether
a decree ought to be entered against the defendant, without
first referring the case to a master "to ascertain the truth of
the allegations, *so that our minds and consciences may be satis-
fied upon the point.*" This branch of the case having been
subsequently argued, the court rendered an opinion, from
which we extract, as follows (12 R. I. 99):

"The defendant entreats for leave to answer, denying them
[the averments of the bill]. . . . . Shall we then proceed as
if they were true. because the defendant, being in contempt,
and unable to relieve himself, cannot make his denial effectual
by answer or defence? The question is novel; but we think
it admits of but one solution. The court must be careful not
to become an instrument of injustice, even against a person

who has forfeited all claims upon its favor. We decide, therefore, that the cause must go to a master to inquire into the truth of the inculpating allegations of the bill, and if he finds them true to any extent, to take the account accordingly, making, for the sake of dispatch, one report of the entire matter. We also decide that in making the inquiry, the master shall not be confined to testimony furnished by the complainants, but shall notify Durant, so that he may be present, if he sees fit, to aid the inquiry, and to testify himself, and furnish the testimony of others."

Nor is there force in the contention that *Allen* v. *Georgia*, 166 U. S. 138, impliedly sustains the validity of the authority exercised by the court of the District of Columbia in the matter now under consideration. In the *Allen case* the accused had been regularly tried and convicted, and the error complained of was that the Georgia Supreme Court had violated the Constitution of the United States in refusing to hear his appeal because he had fled from justice. In affirming the judgment of the Supreme Court of Georgia, the court called attention to the distinction between the inherent right of defence secured by the due process of law clause of the Constitution and the mere grace or favor giving authority to review a judgment by way of error or appeal. It said (p. 140):

"Without attempting to define exactly in what due process of law consists, it is sufficient to say that, if the Supreme Court of a State has acted in consonance with the constitutional laws of a State and its own procedure it could only be in very exceptional circumstances that this court would feel justified in saying that there had been a failure of due legal process. We might ourselves have pursued a different course in this case, but that is not the test. The plaintiff in error must have been deprived of one of those fundamental rights, the observance of which is indispensable to the liberty of the citizen, to justify our interference."

The same view had been previously announced in *McKane* v. *Durston*, 153 U. S. 684, 687, where the court said :

"An appeal from a judgment of conviction is not a matter

of absolute right, independently of constitutional or statutory provisions allowing such appeal. A review by an appellate court of the final judgment in a criminal case, however grave the offence of which the accused is convicted, was not at common law and is not now a necessary element of due process of law. It is wholly within the discretion of the State to allow or not to allow such a review. A citation of authorities upon the point is unnecessary."

Whether in the exercise of its power to punish for a contempt a court would be justified in refusing to permit one in contempt from availing himself of a right granted by statute, where the refusal did not involve the fundamental right of one summoned in a cause to be heard in his defence, and where the one in contempt was an actor invoking the right allowed by statute, is a question not involved in this suit. The right which was here denied by rejecting the answer and taking the bill for confessed because of the contempt involved an essential element of due process of law, and our opinion is therefore exclusively confined to the case before us.

The demonstration of the unsoundness of the contention that courts of equity have claimed and exercised the power to suppress an answer and thereupon render a decree *pro confesso,* which results from the foregoing review of the authorities, is strengthened by the reflection that if such power obtained, then the ancient common law doctrine of "outlawry," and that of the continental systems as to "civil death," would be a part of the chancery law, a theory which could not be admitted without violating the rudimentary conceptions of the fundamental rights of the citizen.

It being therefore clear that the Supreme Court of the District of Columbia did not possess the power to disregard an answer which was in all respects sufficient and had been regularly filed, and to ignore the proof taken in its support, the only question remaining is whether a judgment based upon the exercise of such an assumed power is void for want of jurisdiction, and may therefore be collaterally attacked. It cannot be doubted that where a judgment is rendered without the issuance and service of summons against a party who did

not enter an appearance, the court rendering it is without jurisdiction to do so, and it can be assailed as void whenever presented as a muniment of right against another. Looking at the substance and not the form of the decree in the case of *Hovey* v. *McDonald*, upon which the rights of the plaintiff in error depend, it is plain that the judgment was substantially one without a hearing, for of what efficacy or avail was the summons to appear when the court which issued the summons rendered its judgment upon the theory that the summons was inefficacious, and that the defendant had no right either to appear or to be heard in his defence? As said by this court in *Adams* v. *Postal Telegraph Cable Co.* 155 U. S. 689, 698: " The substance and not the shadow determines the validity of the exercise of the power."

The case at bar is within the principle of the decision in *Windsor* v. *McVeigh, supra.* It is also controlled by the decision in *Reynolds* v. *Stockton,* 140 U. S. 254. In that case, the scope and object of a suit in a court of the State of New York — a judgment recovered in which was sought to be enforced in a court of the State of New Jersey — was the subjection of a fund in the hands of the superintendent of the insurance department of the State of New York to the satisfaction of claims against a New York insurance company which had become amalgamated with a New Jersey corporation which had passed into the hands of a receiver. The New York company and the New Jersey company and its ancillary receiver in the State of New York, one Parker, were made parties defendant. There was no actual appearance by Parker or the New Jersey company subsequent to the filing of their answer. Parker took issue merely upon the allegations of the petition, and the cause proceeded to trial upon such issue before a referee. Upon the report of the latter, a decree was entered which finally disposed of the fund. Paragraph 8 of that decree contained the following reservation:

" And it is further ordered that either party to this action or any person interested in the subject-matter thereof have liberty to apply for further directions on the foot of this

decree, and the question of the indebtedness of Joel Parker, as receiver of the New Jersey Life Insurance Company, and the former superintendent, John F. Smyth, and William McDermott and Messrs. Harris and Rudd, reported by the referee Samuel Prentiss, be reserved."

Subsequently to the entry of the decree just referred to, on notice to the attorney who had represented Parker, a judgment was entered in favor of plaintiffs against the receiver Parker and the New Jersey company for more than a million of dollars. This was the judgment which was sought to be enforced in New Jersey against the assets in the hands of the receiver in that State. The courts of New Jersey decided that the judgment was void, and this court affirmed such decision on the ground that the decree passed upon questions not at issue in the cause, and was rendered against a party who had taken no actual part in the litigation subsequent to the filing of his answer. There is no distinction in principle between determining a cause upon issues not raised by the pleadings in the actual absence of the party, and rendering a decree by refusing to permit a defendant to be heard in his defence or to consider the merits of a sufficient defence, and, indeed, by striking the pleading containing such defence from the files.

As a consequence of the foregoing views, we conclude that the Court of Appeals of New York did not err in refusing to give effect to the judgment in question as against a member of the firm of Riggs & Company, as in the courts of the District of Columbia the decree in question was not entitled to be regarded as valid as to them. Whether since the rendition of the judgment for any cause, such as by reason of active steps taken by McDonald and White, in the courts of New York, assailing the validity of the judgment in question, those parties are now estopped from asserting the invalidity of the decree (*Lawrence* v. *Nelson*, 143 U. S. 215, 223, and cases there cited), we need not determine. It is sufficient for the purposes of the case now before us to say that, as the record contains no proof of facts constituting an estoppel as to Riggs & Company, the judgment is not binding upon them.

From the fact, however, that we rest our decision on the

want of power in the courts of the District of Columbia to suppress an answer of parties defendant, and after so doing to render a decree *pro confesso* as in case of default for want of an answer, we must not be considered as implying that we think the purchasers of the bonds under the circumstances disclosed by the record took them subject in any way to the *lis pendens* created between the actual parties to the controversy arising from the suit, or that such purchasers were or could be in any way bound by the result of that litigation.

*Judgment affirmed.*