CHARLES YORK and CLAUDIA YORK, doing business as YORK MOTOR COMPANY, a Co-partnership; Charles York and CLAUDIA YORK, as individuals,

*Plaintiffs and Appellants,*

vs.

NORTH CENTRAL GAS COMPANY, a Corporation,

*Defendant and Respondent.*

HARRY P. POLLARD and HARDWARE MUTUAL INSURANCE COMPANY, of Minnesota,

*Plaintiffs and Appellants,*

vs.

NORTH CENTRAL GAS COMPANY, a Corporation,

*Defendant and Respondent.*

(Nos. 2449 and 2450; November 20, 1951; 237 Pac. (2d) 845)

100

For the plaintiffs and appellants in each case the causes were submitted on the briefs and also oral argument of C. O. Brown and T. C. Daniels both of Douglas, Wyoming.

For the defendant and respondent in each case the causes were submitted on the brief and also oral argument of Edward E. Murane of Casper, Wyoming.

104

## OPINION

KIMBALL, Chief Justice.

Two actions for property damage caused by an explosion in a business building in Douglas, Converse County, were consolidated for trial in the district court, and for hearing of the appeals in this court. Plaintiffs

and appellants in one action are Pollard, owner of the building, and an insurance company that has paid Pollard a part of the damages. Plaintiffs and appellants in the other action are the Yorks, husband and wife, owners of the contents of the building which they occupied as tenants engaged in the garage business. Defendant and respondent in both actions is a public utility distributing natural gas to inhabitants of Douglas. There was a jury trial resulting in general verdicts for defendant, followed by judgments on the verdicts. The questions raised may be discussed as though we were considering one appeal. There is no difference that need be noticed in the pleadings, motions, orders, judgments or specifications of error in the two cases.

Plaintiffs contend that the trial judge erred in refusing to hold that they had the right to have defendant adjudged in default under a provision of the statute in regard to the procedure on applications for change of venue. The statute (§ 3-1904, C. S. 1945) provides that the party applying for a change must pay the cost thereof within ten days after the order directing the change is made, and must also, within that time, give a bond to the effect that he will pay all costs that may be adjudged against him in such case, and that unless these conditions are met, the application shall be deemed abandoned. This has been the law since the Territorial act of 1877. Laws of 1877, p. 25 § 2. In 1879 the Territorial Legislature inserted an amendment which is still in the law and is the basis of the contention we are now considering. This part of the statute will be referred to below as the act of 1879. It provides that "if the abandonment is by the plaintiff, the cause shall be considered discontinued and the costs taxed against said plaintiff and judgment therefor rendered. And if the abandonment is by the defendant, he shall be adjudged in default, and whatever pleadings he may have on file

disregarded, and the plaintiff may prove his case as in other defaults." Laws of 1879, ch. 85, now a part of § 3-1904, C. S. 1945, supra.

After the cases were at issue and plaintiffs had made demands for jury trial, defendant filed motions and affidavits for change of venue from Converse County on the ground of local prejudice. The motions were granted September 19, 1947, by orders changing the venue to Natrona County, and fixing the amount of bonds to be given by defendant as security for costs. Defendant did not pay the costs of the change or file the bonds until October 8, 1947, nine days too late. Plaintiffs then filed motions alleging abandonment of the change of venue, and applying for an order adjudging defendant in default and plaintiffs entitled to prove their case as in other defaults, as provided by the act of 1879. The trial judge, ruling on the motions, held that the change of venue had been abandoned, and ordered the cases retained for trial in Converse county. It was further ordered that the part of the motions "seeking to have the defendant declared to be in default and plaintiffs permitted to prove their case as on default be denied."

Plaintiffs, in asserting their right to have defendant "adjudged in default," have not charged defendant with bad faith either in applying for, or in failing to perfect, the change of venue. From an affidavit of defendant's attorney it appeared without contradiction that the failure to pay the costs and file the bonds in time was not wilful or intentional, but due, as he says, to "oversight, mistake and inadvertence on his part," under circumstances that we need not set forth.

Plaintiffs rely on the mandatory language of the Act of 1879, which, they argue, is too plain to require interpretation, and leaves nothing to the discretion of the

court. The defendant "shall" be adjudged in default as the penalty for having abandoned his application for change of venue.

We think the word "shall" as here used cannot reasonably be given its ordinarily imperative meaning. In Lambert v. Place, 53 Wyo. 241, 248, 80 Pac. 2nd 425, 428, we quoted from Becker vs. Labanon etc. Ry Co., 188 Pa. 484, 41 Atl. 612: "The word 'shall' when used by the legislature to a court is usually a grant of authority and means 'may' and even if it be intended to be mandatory it must be subject to the necessary limitation that a proper case has been made out for the exercise of the power." See, also, Horack's Sutherland on Statutory Construction, §§ 5810, 5823. At § 5810, the author says: "There is one principle which stands out foremost among the cases dealing with statutes pertaining to judicial action, that the legislature cannot control judicial discretion. A statute directing judicial action, although it may be expressed in peremptory terms, will be construed as permissive or directory only, where constitutional principles of separation of power require a free and unrestrained exercise of judicial discretion."

The act of 1879 is without precedent that we can discover in any other provision of our code, or the statutes of other states. Plaintiffs cite cases giving a mandatory meaning to statutes which provide for dismissal (without prejudice, we assume) of an action commenced in a wrong county unless the plaintiff complies strictly with the conditions necessary to lodge the action in the proper county. See State ex rel. v. Associated Packing Co. 216 Ia. 1053, 250 N.W. 130; Davis v. Superior Court, 184 Cal. 691, 195 P. 390. We think such cases are not in point on the question we are considering.

This court has had occasion to review a ruling on a motion based on the act of 1879 in only one case, Barkwell v. Chatterton, 4 Wyo. 307, 33 Pac. 940, decided in 1893. In that case plaintiff's application for change of venue which had been granted, was abandoned by her failure to file the bond. Defendant on that ground moved to dismiss the action under the act of 1879, then a part of § 3401, R. S. 1887, and plaintiff moved to dismiss without prejudice. See § 2661, R. S. 1887, now § 3-3505, C. S. 1945, providing among other things, that an action may be dismissed without prejudice by the plaintiff before final submission of the cause. Plaintiff's motion was denied; defendant's sustained. Plaintiff evidently fearing that the dismissal under the act of 1879 wiped out her right of action, brought the case to this court on error contending (4 Wyo. 308), among other things, that the act of 1879 was an assumption of judicial power by the legislature; had the effect of depriving her of property without due process of law, and that her motion to dismiss without prejudice should have been granted under § 2661, supra.

The error proceeding in this court was disposed of by deciding that the dismissal of the action under the act of 1879 was without prejudice, which, the court said "removes the only matter of substantial interest in the case." The plaintiff was "practically in the same position as if her own motion had been sustained." 4 Wyo. 312, 33 P. 941. There is no reason to doubt the correctness of that decision.

There would be a curious inequality in penalties imposed under the act if, when invoked against a plaintiff, he suffers only a dismissal without prejudice; and, when invoked against a defendant, he loses the right to be heard on the issues raised by his answer. See Campbell v. Justices, 187 Mass. 509, 73 N.E. 659, 69 L. R. A. 311; O'Neill v. Thomas Day Co., 152 Cal. 357,

362, 92 P. 856, 859; Hovey v. Elliott, 167 U. S. 409, as to the difference in the situations of a plaintiff and a defendant as affecting the courts power to deny a hearing on the merits.

In Barkwell v. Chatterton, supra, the court took occasion to comment on a case in which the act of 1879 had been invoked by a plaintiff against a defendant, as in the case at bar. We quote from 4 Wyo. 312, 33 P. 941: "It was stated in argument, and is generally known to the profession, that a former justice of the Supreme Court of Wyoming Territory refused, when sitting as judge of a district court to disregard the pleadings of a defendant who was in default by abandoning an application for change of venue under this statute. This was in effect setting aside the default which the party had incurred, but which had not been formally declared by the court. There is no doubt that it is within the discretion of a trial court to set aside a default, either on sufficient showing by the party in default, or upon matter within the knowledge of the court as occurring in the progress of the cause. If a trial court abuse such discretion there is no doubt a remedy for such abuse."

The foregoing comment evidently was intended as an approval by this court of the territorial decision. If it was not called for by the issues before the court in the Barkwell case and therefore *obiter dictum*, as plaintiffs say, we may nevertheless accept it as persuasive insofar as it accords with our view that the statute in question should not be given the mandatory meaning contended for by plaintiff's in the case at bar. An *obiter dictum*, though not binding under the principle of *stare decisis*, may be followed if it leads in the right direction.

It was stated in the Barkwell case that the act of 1879 "was evidently aimed to correct the notorious abuses sometimes observed of applications for change

of venue made on false grounds merely for the purpose of delay." We cannot hold that the legislature by the act has deprived the court of the power to hear cases on the merits, in the absence of such abuses. See Rottschaefer on Const. Law, 52, 53. We avoid expressing an opinion in regard to the validity of the act ,or the power of a court to enforce it, as affected by the due process clause of the constitution. That question has not been raised. Hovey v. Elliott, 167 U. S. 409 and Hammond Packing Co. v. Arkansas, 212 U. S. 322 were decided after Barkwell v. Chatterton, supra, and their effect as authorities limiting the power of courts and legislatures to deny a hearing to a defendant who in obedience to the summons has appeared and filed a sufficient answer, need not be considered for the purpose of deciding the point involved in this case.

We hold that the trial judge did not err in denying plaintiffs' motions to have the defendant adjudged in default.

At the trial the judge denied defendant's motions for directed verdicts, and the case went to the jury with instructions that are not criticized. Plaintiffs contend that the verdicts for defendant are not sustained by sufficient evidence, and cite decisions on appeals in actions for damages caused by escaping gas, affirming judgments for plaintiffs on verdicts in their favor, or reversing judgments for defendants on directed verdicts or notwithstanding verdicts for plaintiffs. Those decisions, holding that the evidence favorable to plaintiff was sufficient to take the case to the jury and to support a verdict in his favor, do not mean that a verdict for defendant in the same case would have been set aside. They are consistent with the guiding rule, so often stated by this court, that in considering the sufficiency of the evidence to support a verdict we assume that evidence in favor of the successful party is

true, and give to him the benefit of every favorable inference which fairly and reasonably may be drawn from it. Willis v. Willis, 48 Wyo. 403, 429, 49 P. 2d 670, 678.

The building is 120 feet east and west, 50 feet north and south, two stories and a small basement, 20 x 16 feet and 7 feet deep. The foundation and basement walls are concrete, other walls brick. The rear (east) wall is on the west border line of a north-south alley. The basement where the explosion was set off lies along this wall for 20 feet beneath the southeast corner of the building. It contains the coal room on the south and the furnace room north, partly separated by partition. There are two walled-in shafts or openings extending downward into the basement from their tops which jut 18 inches into the alley. One is the coal chute into the coal room; the other, called the "window-well", extends into the furnace room. The coal chute's top in the alley was covered at the time of the explosion, by a loose iron plate. The window-well was originally intended to serve as an air shaft, but evidently had not been used recently for that purpose. Its top in the alley was covered by boards and ten inches of loose dirt and trash. The alley surface had been raised considerably since the building was erected.

The rear 90 feet of the main floor of the building is the work room where, at the time of the explosion, there were 10 motor vehicles, 8 being repaired or serviced and 2 stored. It was proved by plaintiffs' witnesses that, besides the gasoline in these vehicles, there was about a gallon kept in an uncovered pan and occasionally used in cleaning. From the work room there are two openings into the basement: the stairway at the southeast corner, and a hole through the main floor above the coal room.

York employed two mechanics and the three were

present at the time of the explosion. One of the mechanics did not testify, and the jury did not know what he was doing at the time, or why he was not called as a witness. York and the other mechanic testified that about thirty minutes before the explosion, they had returned from the basement where they had taken the furnace pipe from the chimney and removed from the pipe accumulated ashes, which they dumped on the basement floor near the furnace. During this operation there was a fire in the steam-vapor, coal-burning furnace into which the fuel was fed by a motor-powered stoker.

No natural gas was used in the building, but about one year before the explosion defendant, at the request of a plaintiff, laid a service line extending into the building from its main on the east side of the alley which was not paved. The service line ran west, 18 or 20 inches below the surface, across the alley to a point about 2 inches from the wall of the basement and 17 inches north of the north wall of the window-well; thence up and southernly, about as close to the wall of the building as a mechanic could place it, to a point where it turned and ran through the wall of the building into the work-room above the furnace room. The pipe was cemented to the wall through which it passed and capped at its end. The cement and cap were intact after the explosion.

There was a shut-off valve where the service pipe connected with the main, and another reachable through a curb-box about one foot from the wall of the basement and 17 inches north of the north wall of the protruding window-well. This curb-box was a 4-inch, cast iron, hollow pipe extending from its capped top flush with the alley surface to its base which inclosed the shut-off valve. Neither of these valves was closed at the time of the explosion, and the reason for leaving

them open was not explained or inquired about at the trial. The service line was not used to supply gas to the tenants of the building because needed gas-burning appliances were not obtainable at the time.

There was testimony to justify the jury in refusing to find that there was any defect in the service line due to faulty materials or poor workmanship in its construction, or that there was any break or leak discovered before the explosion. Defendant's gas was regularly odorized, and the odor had never been noticed in the building by York or his employee, even when they were in the basement a few minutes before the explosion.

The building was seriously injured by the explosion which occurred about 5 o'clock in the afternoon of February 17, 1947. Doors and windows were blown out, walls bulged and cracked, the roof lifted. Firemen and others, including defendant's superintendent, were soon at the scene. Fires in the building, which were limited to articles easily kindled, were extinguished without much difficulty. There was also a flame of burning gas coming up in the alley at the curb-box described above. This flame was reduced by water and extinguished by closing the shut-off valve reached through the curb-box. The service line was then uncovered and it was found that the burning gas had escaped through a break at the "nipple" or threaded end of the pipe where it was screwed into the shut-off valve. There was convincing evidence that this was a fresh or "new" break. Opinions of experienced witnesses to that effect were based on the bright appearance of the separated ends of the broken pieces of pipe, which were exhibited to the jury, and the condition of the soil near the break. A plumber, who was working at his truck in the alley 40 or 50 feet from the building, heard the noise and felt the shock of the explosion, saw the iron covering of the coal chute

blown high into the air, and then "seconds later"—after an "appreciable interval"—the flame of burning gas appeared at the curb-box. The covering (boards, dirt and trash) of the window-well was not disturbed by the explosion.

The elements of a cause of action for negligence are set out in Restatement of Torts, § 281, and Prosser on Torts, p. 177. In this case, we refer to only two of these elements which we distinguish by calling one the negligence question, the other the causation question. See Martin v. Herzog, 228 N. Y. 164, 170, 126 N.E. 814, 816. To establish *actionable* negligence plaintiffs had the burden of proving not only that the break in the line was due to defendant's lack of care (the negligence question), but also that the escaping gas was the gas that exploded in the building (the causation question). The general verdict for defendant, which was not accompanied by a particular finding on any question of fact (see § 3-2419, C. S. 1945), may have been based on an implied finding against plaintiffs on one or the other of these questions. We think we cannot hold that the evidence required a finding against defendant on either question.

First, of the negligence question. Defendant could have closed valves that would have excluded gas from the service pipe, but the authorities are in agreement in holding that the failure to do so was not negligence *per se*. Canfield v. W. Va. Central Gas Co., 80 W. Va. 731, 93 S.E. 815, L. R. A. 1918A, 808; Shaw v. Wisconsin P. & L. Co. 256 Wis .176, 40 N.W. 2nd 498; 38 C. J. S., Gas, § 42, p. 739; 24 Ann. Jur., Gas Companies, § 34. From the evidence set out above, the jury had good grounds for believing that the break in the line was caused by some force at or near the time of the explosion. Two such causes were suggested at the trial. Plaintiffs claimed that the break was caused by a truck

running over the top of the curb-box. It was admitted that other pipes had been broken in that way. There was testimony, however, that the curb-box was not damaged, and was in use at another place at the time of trial.

Defendant contended that the break was caused by the explosion, which shook the nearby ground, and seemed not unlike a "small earth quake." A plaintiffs' witness testified that the explosion "jerked" the car she was driving through the alley. In support of defendant's theory as to the cause of the break, there was considerable expert or opinion testimony, and, perhaps more important than anything else, the testimony showing the near-coincidence between the explosion and the appearance of the gas flame in the alley.

We think the jury could reasonably believe that there was not a preponderance of evidence in support of plaintiffs' theory.

There are cases holding, and we may concede, as plaintiffs argue, that the mere facts that a pipe broke and gas escaped are evidence from which a jury may infer that the gas company had been negligent in not preventing the break or leak. This seems to be a sort of *res ipsa loquitur* rule applied on the negligence question. It does not mean that a jury should not give consideration to all other facts and inferences tending to show lack of negligence. See Carmody v. Boston Gaslight Co., 162 Mass. 539, 39 N.E. 184.

We turn to the causation question. If the jury believed that the line broke before the explosion, the verdict may have been based on their refusal to infer that the escaping gas found its way into the building. The problem here relates to actual cause or cause in fact, and we do not have the vexed question of proximate or legal cause. See Harper on Torts, § 109; Prosser on

Torts, p. 321. In many cases actual cause is so clear that there is no dispute about it. When there is dispute, the jury often has to draw inferences to bridge gaps in direct testimony. Plaintiffs' burden of proof may be explained by quoting the words of Judge Rugg in Bigwood v. Boston & Northern Street Ry., 209 Mass. 345, 348, 95 N.E. 751: "By bringing their actions, the plaintiffs assumed the obligation to show that the negligence of the defendant caused their injury. This was an affirmative burden and could not be left to surmise, conjecture or imagination. There must be something amounting to proof, either by direct evidence or rational inference of probabilities from established facts. While the plaintiff is not bound to exclude every other possibility of cause for his injury except that of the negligence of the defendant, he is required to show by evidence a greater likelihood that it came from an act of negligence for which the defendant is responsible than from a cause for which the defendant is not liable. If on all the evidence it is just as reasonable to suppose that the cause is one for which no liability would attach to the defendant as one for which the defendant is liable, then a plaintiff fails to make out his case."

Plaintiffs contended that the escaping gas seeped through the ground to and over the top of the window-well and then down through the well into the furnace room. The expert witness who gave an opinion in support of that theory did not undertake to explain why the gas would not have found an easier outlet at the place where it was ascending and burning after the explosion.

Defendant's expert witnesses testified that escaping natural gas in moving from a break in the line will take the course of least resistance. Being lighter than air it will go up, unless some force or obstruction causes it to move in some other direction. As put by one of the

witnesses, it seeks a point of lower pressure. The atmosphere is the point of lowest pressure. This witness was of opinion that when the line broke below the curb-box, the pressure in the line would have forced the "first puff of gas" one, two or three inches into the surrounding soil where it would meet resistance that would cause it to move up at the curb-box to the atmosphere. He gave reasons for his opinion that it was "highly improbable" that the gas would have moved to and down through the window-well.

The burden of proof on the causation question did not shift to defendant, nor did it assume that burden by alleging in its answer that there were causes for which it was not responsible. Montanari v. Haworth, 108 Oh. St. 8, 140 N.E. 319; Sais v. City Electric Co., 26 N. Mex. 66, 188 Pac. 1110; Hardman v. Younkers, 15 Wash. 2d 483, 131 P. 2d, 177. See Iba v. Central Ass'n. (on petition for rehearing) 5 Wyo. 355, 371, 42 Pac. 20; Mutual Life Ins. Co. v. Summers, 19 Wyo. 441, 452, 120 Pac. 185; Griffin v. Rosenblum, 46 Wyo. 40, 51, 23 P. 2d 348, 351.

On this question of burden of proof, plaintiffs rely on the *res ipsa loquitur* rule, discussed at some length in Stanolind Oil & Gas Co. v. Bunce, 51 Wyo. 1, 62 P. 2d, 1297. The purpose of that rule is to help a plaintiff on the negligence question when the "thing" that caused the harm is not in dispute, as in many cases, or has been proved by a preponderance of the evidence. The rule has no application if an inference to the effect that the accident was due to a cause other than defendant's negligence can be drawn as reasonably as that it was due to his negligence. Stanolind Oil & Gas Co. v. Bunce, 51 Wyo. at pp. 30, 41, 62 P. 2d at pp. 1305, 1310; Benedick v. Potts, 88 Md. 52, 40 Atl. 1067, 41 L. R. A. 478; Hernandez v. Southern Calif. Gas Co., 213 Calif. 384, 2 P. 2d 360; Hamrah v. Clements, 3 N. J. 285, 69 Atl.

2d 720; 45 C. J. 1212, § 780; 65 C. J. S., Negligence § 220, p. 1010.

There was testimony that an explosion may result from the ignition of any combustible substance mixed with air in the right proportions. See 10 Encyclopedia Americana, p. 653. That is probably a reason why, as has been judicially declared, "disastrous explosions have occurred for which no satisfactory explanations have ever been offered." Pierce Oil Corp. v. City of Hope, 248 U. S. 498, 500, quoting from the same case, 127 Ark. 43.

Defendant had the right to argue, and the jury to consider, that there may have been in the basement explosive mixtures with which defendant had nothing to do. See Wigmore on Evidence, § 30 *et. seq.* The evidence suggested coal dust from that kind of coal used in automatic stokers and coal gas that escaped when the furnace pipe was being cleared of refuse matter a short time before the explosion. Evaporation of gasoline in the work-room would have formed a well-known dangerous vapor which, being much heavier than air, may have sunk through openings into the basement.

It is contended that the court erred in refusing to order a new trial applied for by motions accompanied by affidavits. The granting or denial of a new trial rests largely in the discretion of the trial judge. Myuskovich v. State, 59 Wyo. 406, 422, 141 P. 2d 540; Elliott v. Sloan, 38 Wyo. 276, 282, 266 Pac. 1059; Harden v. Card, 15 Wyo. 217, 231, 88 Pac. 217.

The motions in this case were on several grounds. The alleged insufficiency of the evidence requires no further comment. Another ground was misconduct of the jury. Affidavits of jurors in regard to what was said or considered during their deliberations must be disregarded. The general rule that a losing party can-

not, in order to secure a new trial, use the testimony of jurors to impeach their verdict is too firmly settled in this state to be upset by judicial decision. Morris v. State, 39 Wyo. 157, 270 Pac. 415. We may add that the charged misconduct, however proved, did not involve any fatal irregularities. See Wigmore on Evidence, §§ 2349, 2354; Jorgensen v. York Ice Mach. Corp., 160 Fed. 2d 432, 435.

Misconduct of the prevailing party was alleged, but need not be discussed in view of counsel's frank admission that the matters complained of "probably do not amount to misconduct or irregularity."

Newly discovered evidence was another ground of the motions. A new trial on this ground may be denied without error if the judge has reason to believe that the evidence could have been discovered and produced at the trial by the exercise of reasonable diligence (Hardendorf v. Gafner, 53 Wyo. 427, 84 P. 2d 719), or that it probably would not work a different result on a retrial. 30 Am. Jur., New Trial, § 165; 66 C. J. S. New Trial, § 110, p. 312.

The only item of evidence which seems of sufficient importance to call for discussion was in regard to the condition of the window-well through which defendant's gas must have passed to enter the basement. Affiant Conlogue stated that during excavations following the explosion he noticed between the north wall of the window-well and the east wall of the building an opening or crack, about the width of a pencil, caused by the wall of the window-well "pulling away" from the building proper. Plaintiffs York and Pollard stated in their affidavits that they knew nothing of this crack until Conlogue told them about it after the trial. Their explanations as to why they or their attorneys had not discovered the crack in preparing for trial are rather

confusing. Pollard says the well was examined by him and his attorneys on several occasions and appeared to be in normal position. York says the well was uncovered sufficient for "surface" observation by him and his attorneys, who saw no crack. The trial judge may reasonably have believed that if the walls had been separated, as described by Conlogue, the defect was not so concealed that a careful examination would not have disclosed it.

We cannot say that the trial judge erred in denying the motions for a new trial.

The judgments will be affirmed.

BLUME, J., and RINER, J., concur.