The MERCHANTS NATIONAL
BANK OF MOBILE

v.

The DREDGE GENERAL G. L.
GILLESPIE et al., etc.

LOUISIANA LAND AND WATER, INC., Boat, River and Canal, Inc., Production Aggregate and Gravel, Inc., Sealane Aggregates of Alabama, Inc., and Bernie Bierman, Counterplaintiffs,

v.

The MERCHANTS NATIONAL BANK OF MOBILE, Radcliff Materials, Inc., Southern Industries Corporation, Dravo Corporation, Dravo Leasing Company, Ken L. Lott, Melvin Coxwell, Dudley Dawson, and Ball-Co Contractors, Inc., Counterdefendants.

Civ. A. Nos. 79–0986 to 79–0993.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

April 25, 1980.

Johnston, Adams, May, Howard & Hill, Thomas S. Rue and Brock Gordon, Mobile, Ala., for Merchants Nat'l Bank of Mobile.

Levy & Erens, Steven Novack and Steven C. Dupre, Chicago, Ill., for Dredge General G. L. Gillespie.

William R. Forrester, Jr., and S. Rodger Wheaton, Jr., New Orleans, La., for Dravo.

EDWIN F. HUNTER, Jr., Senior District Judge.

## MEMORANDUM RULING ON MOTION TO INVALIDATE AND VACATE SEIZURE OF THE VESSELS

Relying upon several Supreme Court cases holding that certain state attachment and garnishment procedures violate the Due Process Clause of the Fourteenth Amendment,[1] defendants contend that the customary Admiralty procedures *in rem* and *in personam* with process of maritime attachment have been used and abused by plaintiffs in a way which has deprived defendant shipowner, without due process of law, of property rights protected by the Fifth Amendment.

■ The attack here centers on Rule (C)(3), which reads:

"(3) Process. Upon the filing of the complaint the clerk shall forthwith issue a warrant for the arrest of the vessel or other property that is the subject of the action and deliver it to the marshal for service. If the property that is the subject of the action consists in whole or in part of freight, or the proceeds of property sold, or other intangible property, the clerk shall issue a summons directing any person having control of the funds to show cause why they should not be paid into court to abide the judgment." (Supplemental Rules of Admiralty and Maritime Claims).

Six District Courts have upheld the constitutionality of the *in rem* proceedings under Rule C. *Amstar Corp. v. M/V Alexandros T.*, 431 F.Supp. 328 (D.Md.1977); *Central Soya Co. v. Cox Towing Corporation*, 417 F.Supp. 658 (N.D.Miss.1976); *Bethlehem Steel Corporation v. S/T Valiant King*, 1977 A.M.C. 1719 (E.D.Pa.1974); *Stoner v. O/S Neiska II*, 1978 A.M.C. 2650 (D.C.Alaska 1978); *A/S Hjalmer Bjorges Rederi v. The Tugboat CONDOR*, 1979 A.M.C. 1696 (S.D.Cal.1979). The only case to the contrary is *Karl Senner, Inc. v. The M/V Acadian Valor*, 485 F.Supp. 287 (Civ. Act. No. 79–2118; E.D.La.1980.)

No useful purpose is to be served by a review of these well reasoned and detailed opinions. It suffices to say that they are uniform in holding that due process is inherently a flexible concept and what process is due in any situation must be deter-

---

1. *Sniadach v. Family Finance Corporation*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) and *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

mined on a case by case basis, giving due consideration to the functions served and interests affected.

A careful review of the record and the jurisprudence persuades me that this is not a case in which these important and useful admiralty procedures should be declared unconstitutional. On the contrary, the facts of this case and the procedures available to the defendant in this court indicate that defendants have been afforded the protections required by the *Sniadach* line of cases.

From August 19, 1977 through August 18, 1978, defendants made a series of loans from the Merchants National Bank of Mobile totalling $2,213,000. The Dravo debt was $300,000. In order to secure the repayments of the loans, defendants pledged the vessels, now under seizure, as collateral. To date, defendants have made no payments on principal. Because the debts remained unpaid, plaintiffs brought these consolidated actions to foreclose the preferred ship mortgages *in rem* and *in personam* in Admiralty.

The Arlington was seized on May 25, 1979. (Judge Scott's name is typewritten on the photostatic copy of the order of seizure). The other vessels were seized on July 18, 1979 (Judge Stagg's name is typewritten on the photostatic copy of the order of seizure). Local Admiralty Rule 21 of the Western District of Louisiana provides:

> "RULE 21. SUMMARY RELEASE FROM ARREST OR ATTACHMENT
>
> "Whenever there is an arrest *in rem*, or whenever property is attached, the party arrested or any person having a right to intervene in respect of the thing attached, may, upon evidence showing any improper practice or a manifest want of equity on the part of the libellant be entitled to an order requiring the libellant to show cause instanter why the arrest or attachment should not be vacated. * * *."

The term "instanter" is usually understood to mean within twenty-four hours. Black's Law Dictionary, DeLuxe Fourth Edition, page 939. The Arlington was seized on May 25, 1979, the other vessels on July 19, 1979. A minute entry reveals that upon oral instructions from Judge Stagg the cases were consolidated for seizure on July 18, 1979. Personal service was effectuated on July 25, 1979. Mr. Richard Dymond, in behalf of defendants, requested an extension of time until September 30th to retain local counsel and to further answer and/or otherwise plead. Plaintiffs opposed the motion which was subsequently granted by Judge Stagg. On August 27, 1979, the Bank moved for an interlocutory sale of the vessels pursuant to Admiralty Rule E(9)(b). On September 17, defendants filed an answer, a counterclaim and a notification to Judge Scott that they intended to question the constitutionality of the Supplemental Rules for Certain Admiralty and Maritime Claims insofar as they allow for the involuntary prejudgment seizure and sale of property. The Bank then requested a 30-day delay to respond. No opposition to this request is recorded. Judge Stagg granted the delay until October 27th. Extensive discovery followed, and a two-day evidentiary hearing was conducted before Judge Scott on the Motions for Interlocutory Sale. Judge Scott subsequently recused himself from the case.

It is true, as defendants assert, that the Admiralty procedures challenged permit the arrest and seizure of a vessel without requiring that a judicial officer review the pleadings before the writ is issued.[2] However, this one factor does not compel a finding on this record that the defendants' due process rights have been infringed. Quite obviously, defendants had ample notice of the plaintiffs' claims to the vessels as a result of defendants' default in payment on the notes which were secured by preferred mortgages. Each complaint was accompanied by the note and the mortgage

---

**2.** We do not know from this record whether or not there was any judicial review of the pleadings before the writ was issued. Judge Stagg's name is printed on the seizure that was issued in nine of the cases and Judge Scott's name was printed on the seizure which was issued in the Dravo case. Copies of the writ are made a part hereof by reference.

upon which it was based. Defendants were entitled under Rule 21 of this Court to an instant post-seizure consideration by a judicial officer of the validity of the action taken. They made no such request.

The claims asserted are simple. A prima facie case for seizure was stated. Had this Court been asked to review the sufficiency of the complaint at the time it was filed, we would have certainly authorized the seizure, knowing full well that if substantial rights were claimed to have been infringed, they, the defendants, would have been entitled to an instant hearing under Local Admiralty Rule 21.

Causes maintained under Rule C are proceedings *in rem*. It is necessary in such proceedings to obtain the res before jurisdiction may attach. Proceedings *in rem* are maintained for the liabilities of the vessel itself. These proceedings *in rem* serve a substantial purpose, and immediate seizure may be necessary at times. Due process challenges of this sort must be considered in relation to the facts pertaining to each different seizure. Here, by way of repetition, defendants knew that the mortgage notes (on their face) were in default. They were entitled under the local rules of this Court to an instanter post-seizure hearing before a judge. In view of these and other circumstances present in this record, the fact that a judicial officer may not have reviewed the pleadings before the vessels were seized does not compel a finding of constitutional violation here.[3]

The motion to vacate the seizure is denied.

### ORDER FOR INTERLOCUTORY SALE

These admiralty and maritime claims were filed *in rem* by The Merchants National Bank of Mobile (Bank) and Dravo Leasing Company (Dravo), against the Dredge GENERAL G. L. GILLESPIE, the Barge ARLINGTON, the Tug MAC, the Tug HOUGLAND, the Dredge WINDHAM, the Barge ADDSCO 606, the M/V YSD 69, the M/V YSD 33, and the Barge YNG 23, and *in personam* against Louisiana Land and Water, Inc., Boat, River and Canal, Inc., Production Aggregate and Gravel, Inc., and Bernie B. Bierman, seeking the foreclosure of preferred ship mortgages. On August 27, 1979, the Bank and Dravo moved the Court for the interlocutory sale of the vessels. Defendants collectively opposed said sale and a hearing to determine whether a sale was appropriate was had on December 14 and 28, 1979. The hearing was conducted before the Honorable Nauman Scott, Chief Judge of this Court. Judge Scott has recused himself. The record has been transcribed and studied by the Court. Excellent briefs have been filed and arguments heard. We now enter our findings and conclusions.

### FINDINGS OF FACT

1. The Merchants National Bank of Mobile is a national banking association organized and existing under and by virtue of the laws of the United States, with its principal office and place of business in Mobile, Alabama.

2. Dravo Leasing Company is a Delaware corporation with its principal office and place of business in Pittsburgh, Pennsylvania.

3. Louisiana Land and Water, Inc., Boat, River and Canal, Inc., and Production Aggregate and Gravel, Inc. are corporations organized pursuant to the laws of the State of Louisiana.

4. Bernie B. Bierman is a resident of Greenville, Mississippi.

5. The GILLESPIE is a non-self-propelled welded steel hull suction dredge with

---

**3.** We are conversant with Judge Arceneaux's decision in *Senner*, 485 F.Supp. 287 (E.D.La., No. 79–2118). We believe there is a serious question as to the constitutionality of Rule "C." Judge Thomsen, in *Techem*, footnote 17, notes:

"For a general discussion of some of the problems presented by this case, see Morse, *The Conflict Between the Supreme Court Admiralty Rules and Sniadach-Fuentes: a Collision Course?*, 3 Fla.St.U.L.Rev. 1 (1975); McCreary, *Going for the Jugular Vein*: Arrests and Attachments in Admiralty, 28 Ohio St.L.J. 19 (1967).

a wooden superstructure, registered at the Port of Greenville, Mississippi, with Official No. 293396. George Green's survey report provides a detailed description (Defendants' Exh. 84 at 6–9). The dredge has three Fairbanks Morse 10-cylinder diesel engines which drive the dredge pump and generators. The dredge also has other diesel engine, pumps and the usual auxiliary machinery. It dredges the river for gravel and feeds that material into the ARLINGTON for processing.

6. The ARLINGTON is a non-self-propelled barge-type gravel plant with a welded steel hull 160 feet in length, 46 feet in breadth, with a depth of 8½ feet, owned and operated by Boat, River and Canal, Inc. The vessel is registered in the Port of Greenville, Mississippi with Official No. 587118. The vessel has the necessary machinery to separate and classify gravel and sand, including electric motors, generators and diesel engines.

7. The MAC is a steel hull tugboat of the switcher type, registered at the Port of Greenville, Mississippi, Official No. 251040, 47 feet in length, 15 feet in breadth, with a draft of seven feet, of 27 gross tons and 18 net tons, owned and operated by Louisiana Land and Water, Inc.

8. The WARREN HOUGLAND is a gutted hull. It was purchased when it was sunken. Recently, it partially sank again. It has been raised, but must be pumped frequently due to leaks. The Marshal's office had the HOUGLAND raised at a cost of approximately $22,000.

9. The WINDHAM is a non-self-propelled cutter-head type dredge, registered at the Port of Baton Rouge, Louisiana, Official No. 169408. The WINDHAM was in the process of being refurbished and is inoperable. The upper superstructure is wrecked.

10. The ADDSCO 606 is a non-self-propelled welded steel hull deck barge, registered at the Port of Greenville, Mississippi, Official No. 272702. It is in a leaking condition and is probably of little or no value to anyone in its present condition.

11. The YSD 69 is a self-propelled crane barge with a welded steel hull and deckhouse, registered at the Port of Port Arthur, Texas, Official No. 587828. It was used in the construction of the ARLINGTON. The vessel is two screw and propelled by two Superior diesel engines with the usual auxiliary machinery and generators.

12. The YSD 33 is a self-propelled crane barge with a welded steel hull and deckhouse, registered at the Port of Port Arthur, Texas, Official No. 587827. It is owned and operated by Production Aggregate and Gravel, Inc. The vessel is twin screw and propelled by two eight-cylinder Superior diesel engines, with the usual auxiliary machinery and generators.

13. The YNG 23 is an anchor barge with a welded steel hull and deckhouse, registered at the Port of Port Arthur, Texas. According to Mr. Dufour it is in better condition than the other vessels. It has various diesel engines, generators, electric motors and auxiliary equipment.

14. From August 19, 1977 through August 18, 1978, the defendants collectively made a series of loans from the Bank totaling $2.213 million. The repayment of said loans was secured by the pledge of the aforementioned vessels as collateral under preferred ship mortgages.

15. On November 11, 1977, Boat, River and Canal, Inc. obtained a loan of $300,000 from Potomac Sand and Gravel Company. The repayment of this loan was secured by the pledge of the ARLINGTON as collateral under a preferred ship mortgage. That same day, the note and mortgage were assigned to Dravo by Potomac Sand and Gravel Company.

16. No payment of principal or interest was ever made to Dravo.

17. Defendants have made no payments to the Bank on principal and only $8,079.04 in interest.

18. On May 25, 1979, Richard Frandsen, United States Deputy Marshal for the Western District of Louisiana, arrested the ARLINGTON where it had been berthed by

defendants in a remote area on the western side of the Mississippi River in Delta, Louisiana. The chief engineer on the ARLINGTON, Larry Wesson, was appointed keeper by consent.

19. Thereafter, counsel agreed to a temporary delay of proceedings against the vessel because the owner was making an attempt to negotiate a sale of the ARLINGTON and use the proceeds to pay off Dravo.

20. On July 18, 1979, Deputy Marshal Frandsen arrested the other eight vessels at the same place he had arrested the ARLINGTON. Judge Stagg signed an order of consolidation for seizure purposes on the same date.

21. Prior to April 10, 1980, all the vessels were tied to the west bank of the river, to an island in the river, to each other, or, in the cases of the GILLESPIE and YNG 23, were anchored in the river.

22. The description of the moorings for the vessels seized in the above-captioned actions which are contained in the survey reports of George Green accurately reflects the manner in which those vessels were moored, prior to April 10, 1980.

23. On the morning of April 10, 1980, seven of the vessels broke loose from their moorings and floated down the Mississippi River and under the Vicksburg Bridge.

24. The U. S. Marshal advised the Court and counsel of this near tragedy. The vessels were eventually taken into custody by the U. S. Coast Guard. On April 11th a telephonic conference call was initiated by the Court with Mr. Rue (representing the Bank), Mr. Bierman and his counsel (Mr. Novack). As a result of that conference the Court wrote its letter of April 11, 1980, a copy of which is attached.

25. All of the vessels are now in the Vicksburg Harbor.

26. The fact that the vessels were in great danger and constituted a public hazard in their April 10th moorings has been proven by the happenings of April 10, 1980.

27. The present location of the vessels in the Vicksburg Harbor was ordered by the Court in its letter of April 11th. Mr. Bier-

man suggested during the three-way telephonic conversation that this would be the safest location.

28. There is a conflict in the evidence as to whether the vessels were deteriorating. George Green, William Welsh and Odis Lowery testified for defendants. We will not comment on their testimony as it related to evaluation and suitability of the pre-April 10th moorings. Mr. Green's analogy best sums up the arguments of the defendants concerning deterioration:

"And as for laying up your equipment, I am sure, pretty sure, I would bet on it, that there are a few of us in this courtroom that can remember Hitler's war, and our gasoline automobile engines, which are really actually when you are laying up anything, is no different than a diesel. And when we all got into uniform and marched away we shut off our engines to our cars and turned the cars over to Pop and said, hey, keep that kid brother away from that, I am coming back and I want it. And that is all we did. We didn't lubricate those gas engines, we didn't break them down, we didn't drain them. And some of us went away for two years or longer. When we came back the tires were flat and the battery was dead, so we pumped up the tires, we got a new battery and it ran. This is not hearsay, this is a fact. And I am sure that there are people here that are aware of this. On these diesel engines lubrication is a policy. As a surveyor I would have to say, yes, do it, turn them over regularly and periodically. But if it didn't or you don't, would they be worth nothing in a year or two years or three years, I don't think so." (Tr. at 298).

29. Frandsen described the vessels as being in a neglected condition when he seized them. Several of the barges were taking on water and had to be pumped and they were deteriorating like any piece of equipment that was not used.

30. The Bank's expert maritime surveyor, Norman Dufour, was a 1971 graduate of the United States Coast Guard Academy

where he received a B.S. in Marine Engineering with an emphasis in mechanical engineering. He testified that the vessels were laid up when he inspected them, but that they were deteriorating and if allowed to continue in their laid up condition until July, 1980, all the machinery on board the vessels would need to be completely overhauled.

31. Since the seizure, the vessels have remained in a laid up status with no regular crew attending the vessels and no routine maintenance being performed on the vessels or their machinery. If allowed to sit idle without routine maintenance the engines can rust and freeze up, necessitating costly overhaul. Proper lay up precautions would have been to have placed a pre-lube pump on the engines and to turn the engines over twice each week, either mechanically or manually. Defendants' surveyor, Green, agreed that this was proper lay up procedure.

32. The hulls of all the vessels and the superstructures of all the vessels, except the GILLESPIE, are made of steel. The superstructure of the GILLESPIE is made of wood. If these surfaces are not properly chipped and painted, they will deteriorate. They are not now being so maintained.

33. Plaintiff's Exhibit No. 1, which contains the vouchers for the Marshal's expenditures during the seizure, approximates expenditures of $7,000 per month and the Court so finds.

34. From August 1, 1979, the Bank has borne the expense of insuring the vessels which has cost in excess of $10,000 per month. The total expenses attributable to the vessels during seizure have been over $17,000 per month.

35. The Bank's expert fixed the fair market values: the Barge ARLINGTON, $895,000; the Dredge GENERAL G. L. GILLESPIE, $670,000; the Dredge WINDHAM, $265,000; the Tug HOUGLAND, $75,000; the Barge YNG 23, $195,000; the M/V YSD 69, $105,000 the M/V YSD 33, $115,000; the Tug MAC, $20,000; and the Barge ADDSCO 606, $50,000.

36. These values vary from those determined by defendants' surveyor, Green, who valued the vessels as follows: ARLINGTON, $1,850,000; GILLESPIE, $1,600,000; WINDHAM, $280,000; HOUGLAND, $250,000; YNG 23, $600,000; YSD 69, $295,000; YSD 33, $295,000; MAC, $50,000; and ADDSCO 606, $35,000. There is a $2,865,000 difference between the total collateral values.

37. Defendants paid $800,000 for the GILLESPIE and $400,000 for the ARLINGTON in 1977. Substantial improvements were made.

38. We find that the total fair market value of the collateral is slightly in excess of the amount secured ($2,664,583.62 debt of principal and interest to the Bank and a principal debt to Dravo of $300,000 plus interest since November 11, 1977). These figures do not include costs which are attributable to the seizure which are accruing at an average of $17,000 per month, or attorney's fees. Our estimate is liberal. The defendants have been seeking to sell the property for ten months. There have been prospects but no buyers. We can only judge the future by the past.

39. Interrogation of counsel and my own experience persuades me that the issues here raised (anti-trust, et al) will still be in litigation three years from now. We are persuaded that we should not wait until the costs have eroded a substantial portion or all of the values of the vessels. Any additional costs will further erode the value of the collateral as it is applied to satisfy the debt, to the detriment of all concerned.

40. Claims to the vessels were filed on behalf of the owners on August 3, 1979. The owners have never posted bond, entered into any stipulation or otherwise attempted to secure the release of the vessels pursuant to Admiralty Rule E(5). Eight months have elapsed since the seizure and the defendants are obviously not going to secure the release of the vessels under Admiralty Rule E(5). Under these circumstances, the Court finds that there has been an unreasonable delay in securing the release of the vessels.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter based upon its admiralty and maritime jurisdiction, 28 U.S.C.A. § 1331(a) and based upon the Ship Mortgage Act, 46 U.S. C.A. § 951.

2. These are cases involving the foreclosure of preferred ship mortgages. The matters now before the Court are the Bank and Dravo's motions for interlocutory sale of nine vessels. The interlocutory sale of vessels is governed by Supplemental Admiralty Rule E(9)(b).

3. In accordance with this Court's findings of fact, we conclude that the interlocutory sale of the vessels, pursuant to Supplemental Admiralty Rule E(9)(b) is appropriate for the following reasons: (1) the vessels are liable to deterioration and injury, indeed, all of the vessels have suffered actual deterioration and some of them have sustained actual injury, particularly the ADDSCO 606 and the HOUGLAND; (2) the expense of keeping the vessels, approximately $17,000 per month, is excessive and disproportionate; and (3) the vessel owners have made no offer to secure the release of the vessels through bond, stipulation of otherwise, pursuant to Supplemental Admiralty Rule E(5). *Flota Maritima Browning de Cuba v. M/V CIUDAD de la Habana*, 245 F.Supp. 205 (D.Md.1965), aff'd, 363 F.2d 733 (4 Cir.), *cert. den.*, 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71 (1966); *Chandler v. The Willamette Valley*, 63 F. 130 (N.D.Cal.1894).

4. The vessels have been under seizure since July 19, 1979 and efforts to consummate a private sale have not succeeded.

5. This litigation (the affirmative defenses and counterclaim) will be in the courts for at least several more years.

An order for the sale of the vessels should be entered forthwith. It is. The sale is to take place in Monroe, Louisiana on June 30, 1980. Notice of the sale shall be published once a week for at least four weeks in the Monroe, Louisiana *Morning World* and the *Wall Street Journal*.

An appropriate order setting forth the details of the sale should be prepared and presented by plaintiffs' counsel within five (5) days.