**ALYESKA PIPELINE SERVICE COMPANY, a Delaware Corporation, Individually and as Agent for Amerada Hess Pipeline Corp., ARCO Pipeline, Co., BP Pipelines, Inc., Exxon Pipeline Company, Phillips Alaska Pipeline Company, Sohio Pipeline Company and Union Alaska Pipeline Company, Plaintiff,**

v.

**The Vessel BAY RIDGE, her engines, masts, bowsprit, boats, anchors, chains, cable, rigging, tackle, apparel, furniture, and all other necessaries thereunto appertaining, Defendant,**

and

**United States Trust Company, Richmond Tankers, Inc., Seatrain Lines, Inc., and Pierce Tankers, Inc., Claimants.**

Civ. No. A 80–147.

United States District Court, D. Alaska.

March 16, 1981.

Arden Page, Burr, Pease & Kurtz, Anchorage, Alaska, for plaintiffs.

Michael H. Woodell and Ann Stokes, Bradbury, Bliss & Riordan, Anchorage, Alaska, for defendant and claimants.

## OPINION

FITZGERALD, District Judge.

In this admiralty action Alyeska Pipeline Service Company undertakes to recover cleanup costs resulting from an accidental oil discharge at the Alyeska Valdez Terminal on April 14, 1980. Alyeska maintains the discharge was due to the negligence of the T/T BAY RIDGE and claims a maritime lien against the vessel. On May 19, 1980 the BAY RIDGE was arrested pursuant to Supplemental Rule C of the Federal Rules of Civil Procedure.[1] Claimants now

---

1. Supplemental Rule C of the Federal Rules of Civil Procedure [hereinafter Rule C] reads as follows:

   **Rule C. Actions In Rem: Special Provisions**
   (1) When Available. An action in rem may be brought:
   (a) To enforce any maritime lien;
   (b) Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto.

   Except as otherwise provided by law a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable.

   Statutory provisions exempting vessels or other property owned or possessed by or operated by or for the United States from arrest or seizure are not affected by this rule. When a statute so provides, an action against the United States or an instrumentality thereof may proceed on in rem principles.

   (2) Complaint. In actions in rem the complaint shall be verified on oath or solemn affirmation. It shall describe with reasona-

   ble particularity the property that is the subject of the action and state that it is within the district or will be during the pendency of the action. In actions for the enforcement of forfeitures for violation of any statute of the United States the complaint shall state the place of seizure and whether it was on land or on navigable waters, and shall contain such allegations as may be required by the statute pursuant to which the action is brought.

   (3) Process. Upon the filing of the complaint the clerk shall forthwith issue a warrant for the arrest of the vessel or other property that is the subject of the action and deliver it to the marshal for service. If the property that is the subject of the action consists in whole or in part of freight, or the proceeds of property sold, or other intangible property, the clerk shall issue a summons directing any person having control of the funds to show cause why they should not be paid into court to abide the judgment.

move to vacate the arrest and dismiss the complaint against the vessel on grounds that Rule C violates fundamental due process standards guaranteed by the Fifth Amendment to the United States Constitution and is, therefore, unconstitutional. Claimants further contend that under the circumstances, Alyeska has no in rem claim.

The BAY RIDGE is a 225,000 deadweight ton tanker of United States registry built in 1978–1979 at Brooklyn Naval Shipyard, Brooklyn, N.Y. The vessel is owned by U. S. Trust Company, New York, and is bareboat chartered to Richmond Tankers, time chartered to Seatrain Lines, Inc., sub-time chartered to Pierce Tankers, Inc.,[2] and operated by Bay, Tankers, Inc. The vessel entered service on February 22, 1980 and arrived at Valdez on April 13, 1980 on her maiden voyage docking at Berth # 5, Alyeska Terminal.

Because the vessel's tanks were oil free, Alyeska requested and received permission from the Alaska Department of Environmental Conservation to discharge ballast into the sea rather than into the terminal's ballast treatment plant. After approximately five and one-half hours of pumping, the chief officer of the BAY RIDGE noted muddy water coming from the area near the sea valve opening located on the bottom of the vessel. He transferred suction to another cargo tank and later, by agreement with Alyeska personnel, made arrangements to pump into the ballast treatment plant.

At approximately 0938 on April 14, 1980, the terminal reported to the vessel that it had opened all appropriate valves in its dirty ballast lines and was ready to receive ballast ashore. Shortly thereafter oil was observed in the seawater between the vessel and the dock and transfer operations were immediately halted. The Department of Environmental Conservation estimated that approximately 1,000 gallons (24 barrels) of crude oil spilled into the harbor.

It is undisputed that the spilled oil escaped from Alyeska's own dirty ballast line. It now appears that as the BAY RIDGE attempted to begin pumping its clean ballast ashore, the head pressure in the dirty ballast line caused the oily ballast contained in the line—ballast which had been discharged by prior vessels—to be discharged

(4) Notice. No notice other than the execution of the process is required when the property that is the subject of the action has been released in accordance with Rule E(5). If the property is not released within 10 days after execution of process, the plaintiff shall promptly or within such time as may be allowed by the court cause public notice of the action and arrest to be given in a newspaper of general circulation in the district, designated by order of the court. Such notice shall specify the time within which the answer is required to be filed as provided by subdivision (6) of this rule. This rule does not affect the requirements of notice in actions to foreclose a preferred ship mortgage pursuant to the Act of June 5, 1920, ch. 250, § 30, as amended.

(5) Ancillary Process. In any action in rem in which process has been served as provided by this rule, if any part of the property that is the subject of the action has not been brought within the control of the court because it has been removed or sold, or because it is intangible property in the hands of a person who has not been served with process, the court may, on motion order any person having possession or control of such property or its proceeds to show cause why it should not be delivered into the custody of the marshal or paid into court to abide the judgment; and, after hearing, the court may enter such judgment as law and justice may require.

(6) Claim and Answer; Interrogatories. The claimant of property that is the subject of an action in rem shall file his claim within 10 days after process has been executed, or within such additional time as may be allowed by the court, and shall serve his answer within 20 days after the filing of the claim. The claim shall be verified on oath or solemn affirmation, and shall state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action. If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that he is duly authorized to make the claim. At the time of answering the claimant shall also serve answers to any interrogatories served with the complaint. In actions in rem interrogatories may be so served without leave of court.

**2.** United States Trust Company, Richmond Tankers, Inc., Seatrain Lines, Inc., and Pierce Tankers, Inc., are claimants in this action.

into the vessel's piping system through the vessel's sea valve into Valdez Harbor. Each side alleges the spill occurred due to the negligence of the other.

Alyeska in compliance with the Trans-Alaska Pipeline Authorization Act,[3] promptly initiated cleanup efforts. After considerable delay, the BAY RIDGE completed loading and on April 19, 1980, departed Valdez for Panama. When she returned to Valdez on May 19, on her next scheduled call, she was arrested by the U. S. Marshal.[4]

■ Claimants' initial contention is that the complaint fails to state a claim giving rise to an in rem action against the vessel. In order to bring such an action the plaintiff's claim must create a maritime lien.[5] Claimants suggest that costs of removing oil from navigable waters do not establish a maritime lien enforceable by a private party. But in *California Department of Fish and Game v. S. S. BOURNEMOUTH*,[6] a suit for cleanup costs incurred by the State of California due to an oil spill, it was held that oil pollution of navigable waters amounted to a maritime tort giving rise to a maritime lien sufficient to support an in rem proceedings. There the court stated:

> Oil pollution of the nation's navigable waters by seagoing vessels both foreign and domestic is a serious and growing problem. The cost to the public, both directly in terms of damage to the water and indirectly of abatement is considerable. In cases where it can be proven that

such damage to property does in fact occur, the governmental agencies charged with protecting the public interest have a right of recourse in rem against the offending vessel for damages to compensate for the loss.[7]

Although claimants argue that the holding in *BOURNEMOUTH* ought to be limited to those cases where governmental agencies incur the cleanup costs, I can see little justification for such a rule. Where private parties such as Alyeska are, by statute, made responsible for protecting the public interest recourse should be available through in rem proceedings against the offending vessel. Accordingly, I conclude the complaint of Alyeska states a claim sufficient to support an action in rem against the BAY RIDGE.

Claimants also challenge the procedure by which the BAY RIDGE was arrested. They contend that Rule C violates the principles of procedural due process as enunciated in the United States Supreme Court's decisions in *Sniadach v. Family Finance Corp.*,[8] *Fuentes v. Shevin*,[9] *Mitchell v. W. T. Grant Co.*,[10] and *North Georgia Finishing v. Di-Chem.*[11]

In *Sniadach v. Family Finance Corp.* the Supreme Court struck down Wisconsin's prejudgment wage garnishment procedure as a deprivation of property without due process of law, noting that "the wage earner is deprived of his enjoyment of earned wages without any opportunity to be heard

---

3. 43 U.S.C. § 1653(b) (1980).

4. Following the procedures of Rule C, the arrest warrant was issued by the clerk of the court, without any judicial participation, based on allegations of negligence and unseaworthiness contained in the complaint which was verified on information and belief by plaintiffs' counsel. No bond was posted. On May 20, 1980 claimants brought a motion for hearing on shortened time to prescribe security for release of the vessel which was heard by the United States Magistrate. The vessel was released on May 21, 1980 on bond of $450,000.

5. *THE RESOLUTE*, 168 U.S. 437, 440, 18 S.Ct. 112, 113, 42 L.Ed. 533 (1897); *THE DUTCHESS*, 15 F.2d 198, 199 (E.D.N.Y.1926).

6. 307 F.Supp. 922 (C.D.Calif.1969).

7. *Id.* at 929.

8. 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

9. 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 566 (1972).

10. 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).

11. 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

and to tender any defense he may have...." [12]

Although some thought that the *Sniadach* holding was limited to the narrow issue of garnishment of wages,[13] the Court's subsequent decision in *Fuentes v. Shevin* made it clear that an opportunity for a hearing prior to a taking was a constitutional requirement regardless of the characteristics of the property involved. In *Fuentes* the Court struck down Florida and Pennsylvania laws authorizing the summary seizure of personal property under a writ of replevin. Both statutes provided for writs ordering state agents to seize such possessions, simply upon an *ex parte* application accompanied by a security bond. Neither statute provided for notice to one in possession of the property, or provided an opportunity to challenge the seizure at a prior hearing. However, the property might be recovered within three days after seizure if a recovery bond was substituted for the property.

The Court began its analysis of the challenged statutes by explaining:

For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale*, 1 Wall. 223, 233, 68 U.S. 223, 17 L.Ed. 531. See *Windsor v. McVeigh*, 93 U.S. 274, 23 L.Ed. 914; *Hovey v. Elliott*, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215; *Grannis v. Ordean*, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363. It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62.[14]

The Court recognized that notice and a hearing are ordinarily required before property can be taken, although it explained:

There are "extraordinary situations" that justify postponing notice and opportunity for a hearing. *Boddie v. Connecticut*, 401 U.S., at 379, 91 S.Ct., at 786. These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.[15]

Seizure by self-interested private parties is not an "extraordinary situation." [16]

The *Fuentes* court concluded "that the Florida and Pennsylvania prejudgment replevin provisions work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor." [17]

Some commentators have suggested that, in *Mitchell v. W. T. Grant Co.*, the Court may have retreated from its holdings in *Fuentes* and *Sniadach*. In *Mitchell*, the Court upheld Louisiana sequestration procedures allowing prejudgment seizure without prior notice or opportunity to be heard. The Court focused on the joint interest of both the seller and the buyer in the property seized, and explained "[r]esolution of the due process question must take account not only of the interests of the buyer of the

---

**12.** 395 U.S. at 339, 89 S.Ct. at 1821.

**13.** *See e. g.*, Note, *Some Implications of Sniadach*, 70 Columbia L.Rev. 942 (1970). Several courts also narrowly limited *Sniadach*. *See e. g.*, *Brunswick Corp. v. J & P, Inc.*, 424 F.2d 100, 105 (10th Cir. 1970); *Epps v. Cortese*, 326 F.Supp. 127, 133 (E.D.Pa.1971).

**14.** 407 U.S. at 80, 92 S.Ct. at 1994.

**15.** *Id.* at 90–91, 92 S.Ct. at 1999. (footnotes omitted).

**16.** *Id.* at 92–93, 92 S.Ct. at 2000.

**17.** *Id.* at 96, 92 S.Ct. at 2002.

property but those of the seller as well." [18] After examining the Louisiana statute, the Court found three provisions dispositive: (1) the statute provided for judicial supervision of the writ issuing procedure; (2) the statute required that the writ issue only if the basis of the claim was shown in a verified petition or affidavit containing specific, non-conclusory facts; and (3) the statute provided for an immediate post-seizure hearing.[19] Upon balancing the rights of the buyer and seller, the Court concluded that these procedural protections effected "a constitutional accommodation of the conflicting interests of the parties."[20] The procedural protections built into the Louisiana statute eliminated any requirement for an opportunity to be heard preceding seizure.

In *North Georgia Finishing, Inc. v. Di-Chem., Inc.*, the most recent decision on the subject, the Court struck down a Georgia garnishment statute. Under the statute a writ of garnishment was issuable by the court clerk on an affidavit of a creditor or his attorney. The affidavit had only to contain conclusory allegations, and the statute included no provisions for an early post-seizure hearing.[21] Reaffirming the principles expressed in *Fuentes*, the Court struck down the statute as inadequate under the Due Process Clause of the Fourteenth Amendment.

The approach taken by the Court in these cases is consistent with the oft repeated observations that:

> The requirements of due process of law "are not technical, nor is any particular form of procedure necessary." [Cite omitted]. Due process of law guarantees

"no particular form of procedure; it protects substantial rights." [Cite omitted]. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." [Cite omitted].[22]

The Court's determination of what due process requires in a given context has depended on a consideration of the nature of the governmental function involved and the private interests affected.[23] As a general rule in order to satisfy due process the Court's approach requires, at a minimum, that before seizure a judicial official review the specific facts underlying the claim. Due process requires as well the opportunity for a prompt post-seizure judicial hearing and an opportunity to obtain release of the seized items upon posting of adequate security.[24]

■ Admiralty Rule C fails to provide these minimum protections. The *ex parte* warrant of arrest is issued, as of course, by the clerk without judicial participation. Although the complaint supporting the arrest must be verified, it need contain only conclusory allegations and may be verified on information and belief by counsel. No bond prior to arrest is required. As in *Sniadach*, prompt notice to the owner of the vessel need not be given, and notice by publication may be sufficient. Finally, while a prompt post-seizure hearing can usually be obtained under local rules or custom, nothing in Rule C or the Local Admiralty Rules of this district *assures* that a prompt post-seizure hearing can be obtained. The procedures required by Admiralty Rule C fail to provide the due process standards now well established by the Supreme Court.

18. 416 U.S. at 604, 94 S.Ct. at 1898.

19. *Id.* at 605–606, & 615–18, 94 S.Ct. at 1899, and 1904–1905.

20. *Id.* at 607, 94 S.Ct. at 1900.

21. 419 U.S. at 607, 95 S.Ct. at 722.

22. *Mitchell v. W. T. Grant Co.*, 416 U.S. at 610, 94 S.Ct. at 1901 (citations omitted).

23. *See Mitchell v. W. T. Grant Co.*, 416 U.S. at 624, 94 S.Ct. at 1908 (Powell, J. concurring).

24. *Cf. Grand Bahama Pet. Co. Ltd. v. Canadian Transp. Agencies, Ltd.*, 450 F.Supp. 447, 459 n. 84 (W.D.Wash.1978) (holding Rule B unconstitutional). *See also* Note, *Due Process in Admiralty Arrest and Attachment*, 56 Texas L.Rev. 1091 (1978); Note, *The Due Process Mandate and the Constitutionality of Admiralty Arrests and Attachments Pursuant to Supplemental Rules B and C*, 12 Vanderbilt J. of Transn. Law 421 (1979).

Seven prior decisions, including those of this court, have upheld the constitutionality of Rule C in various contexts.[25] Many of these decisions rely upon the "extraordinary situation" exception in *Fuentes*.[26] Pursuing this analysis courts have often cited *Ownbey v. Morgan*[27] for the holding that seizure prior to hearing is permissible where necessary to secure the jurisdiction of the court.[28] Whether *Ownbey* ever stood for such a proposition is questionable, however.[29] In *Ownbey* the Court upheld the constitutionality of a Delaware attachment statute which precluded the entry of appearance and defense by a nonresident defendant whose property had been attached, except upon posting of special bail. Ownbey, who could not post the bail, attacked the bail requirement. The Court upheld the statute and, in dictum, approved the attachment as well. *Ownbey* was cited in *Fuentes* and *Mitchell* for the propositions that due process does not require that foreign attachments be preceded by notice and a hearing, and it has been suggested that the case must be limited to that.[30] Moreover, the continuing vitality of *Ownbey* is doubtful given the Supreme Court's recent decision in *Shaffer v. Heitner*.[31] There, the Court held that all assertions of jurisdiction should be measured by the general standard of minimum contacts as first announced in *International Shoe v. Washington*.[32] *Shaffer* invalidated the use of quasi in rem jurisdiction as an intrinsically adequate basis of jurisdiction[33] and specifically stated

**25.** *See e. g., United States v. KAIYO MARU No. 53*, 503 F.Supp. 1075 (D.Alaska 1980); *Merchants Nat. Bank v. Dredge General G. L. GILLESPIE*, 488 F.Supp. 1302 (W.D.La.1980); *Amstar Corp. v. M/V ALEXANDROS T.*, 431 F.Supp. 328 (D.Md.1977); *Central Soya Co. v. Cox Towing Corp.*, 417 F.Supp. 658 (N.D.Miss. 1976); *A/S Hjalmer Bjorges Rederi v. The Tugboat CONDOR*, 1979 A.M.C. 1696 (S.D.Cal. 1979); *Stoner v. O/S NEISKA II*, 1978 A.M.C. 2650 (D.Alaska 1978); *Bethlehem Steel Corp. v. S/T VALIANT KING*, 1977 A.M.C. 1719 (E.D.Pa.1974). Other courts have expressed doubts about the constitutionality of the rule or held the rule unconstitutional. *See e. g., Karl Senner, Inc. v. M/V ACADIAN VALOR*, 485 F.Supp. 287 (E.D.La.1980); *Techem Chemical Co. v. M/T CHOYO MARU*, 416 F.Supp. 960 (D.Md.1976); *P. C. International, Inc. v. Vessel SUSAN*, 1980 A.M.C. 2062 (S.D.Fla.1980).

**26.** *See e. g., United States v. KAIYO MARU No. 53*, 503 F.Supp. 1075 (D.Alaska 1980); *Central Soya Co. v. Cox Towing Corp.*, 417 F.Supp. at 662–64; *A/S Hjalmer Bjorges Rederi v. The Tugboat CONDOR*, 1979 A.M.A. at 1702; *Stoner v. O/S NEISKA II*, 1978 A.M.C. at 2651.

**27.** 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921).

**28.** *See e. g., Central Soya Co. v. Cox Towing Corp.*, 417 F.Supp. at 663–64; *Stoner v. O/S NEISKA, II*, 978 A.M.C. at 2651. Cf. *Merchants Nat'l Bank v. Dredge General G. L. GILLESPIE*, 488 F.Supp. at 1305 and *A/S Hjalmer Bjorges Rederi v. The Tugboat CONDOR*,

1979 A.M.C. 1702 (using the rationale without citing the *Ownbey* case.)

**29.** *See* Morse, *The Conflict Between the Supreme Court Admiralty Rules and Sniadach-Fuentes: A Collision Course?* 3 Fla.St.Univ.L. Rev. 1, 12–16 (1975).

**30.** *Jonnet v. Dollar Sav. Bank*, 530 F.2d 1123, 1128 (3d Cir. 1976).

**31.** 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

**32.** 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

**33.** It has been suggested by some commentators that *Shaffer* mandates that the remedy of maritime attachment should also be measured by the minimum contact standard and that jurisdiction in rem or quasi in rem should not attach in an admiralty context if minimum contacts are not present. *See* Olsen, *Jurisdiction in Admiralty: Pennoyer v. Neff in Ship's Clothing?*, 84 Dick L.Rev. 395 (1980). Court have not agreed however, exempting maritime attachment from the reach of *Shaffer*. *See Grand Bahama Petroleum Co. v. Canadian Transp. Agencies, Ltd.*, 450 F.Supp. at 452–55; *Engineering Equip. Co. v. S. S. SELENE*, 446 F.Supp. 706 (S.D.N.Y.1978). I need not decide this issue as both parties concede that under the facts of this case sufficient minimum contacts over claimants exist.

that "[w]e do not read the recent references to *Ownbey* as necessarily suggesting that *Ownbey* is consistent with more recent decisions interpreting the Due Process Clause." [34] The Court went on to overrule all prior decisions to the extent they were inconsistent with *Shaffer*.[35] I conclude therefore that *Ownbey* holds little precedential value after *Shaffer*.[36]

The Supreme Court in *Calero-Toledo v. Pearson Yacht Leasing Co.*,[37] has suggested that acquiring jurisdiction is not an end in itself unless accomplished in service of an important governmental or public interest. When only private interests are involved the "extraordinary situation" exception is not established.[38] As noted by one court:

> Application of jurisdiction-securing devices must, therefore, be narrow, and linked to an important governmental or public interest. The need to assess "the costs the procedure exacts [of] private interests," must not replace procedural safeguards when the seizure is initiated by self-interested private parties.[39]

I conclude that when a vessel arrest is initiated by private parties the "extraordinary situation" exception of *Fuentes* or the use of seizure to obtain in rem jurisdiction does not legitimate the use of Rule C to effectuate the arrest absent the procedural safeguards mandated by *Sniadach-Fuentes* and their progeny.

Previous decisions of this court do not require a different conclusion. In *Stoner v. The Oil Screw NEISKA II*,[40] Judge von der Heydt held Rule C constitutional based on the citation in *Fuentes* to *Ownbey*,[41] reasoning that this reference created an exception to the *Fuentes* rule where seizure was necessary to obtain in rem jurisdiction. As previously discussed, *Shaffer* casts doubt upon the validity of such an exception. *Stoner* also involved truly exigent circumstances as the owner allegedly had already attempted to conceal the vessel by illegally changing its name, and had also threatened to scuttle it.

This court has also upheld the constitutionality of Rule C in *United States v. KAIYO MARU No. 53*.[42] There, seizure was made by the United States Coast Guard in order to enforce provisions of the Fisheries Conservation and Management Act.[43] I held that the seizure satisfied the "extraordinary situation" exception recognized in *Fuentes* and more fully explained in *Calero-Toledo*. Seizure and arrest of vessels play a crucial role in enforcement of the FCMA, thereby serving significant governmental purposes. Such enforcement would be difficult, if not impossible, were advance warning of seizure necessary. Finally, in *KAIYO MARU* the seizure and arrest of the vessel was not initiated by self-interested private parties but was done under direction of the Coast Guard after consultation with the United States Departments of State and Commerce. That Rule C was found constitutional in *KAIYO MARU* lends no support for its constitutionality under the facts of this case.

I conclude that under the circumstances of this case the arrest of the BAY RIDGE under Rule C violates the fundamental due process standards required by the Fifth Amendment of the United States Constitu-

---

**34.** 433 U.S. at 194 n. 10, 97 S.Ct. at 2574 n. 10.

**35.** *Id.* at 212 n. 39, 97 S.Ct. at 2584 n. 39.

**36.** *See also, Karl Senner, Inc. v. M/V ACADIAN VALOR,* 485 F.Supp. at 291.

**37.** 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 *rehearing denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974).

**38.** *Fuentes v. Shevin,* 407 U.S. at 90–93, 92 S.Ct. at 1999–2000.

**39.** *Karl Senner, Inc. v. M/V ACADIAN VALOR,* 485 F.Supp. at 292.

**40.** 1978 A.M.C. 2650 (D.Alaska 1978).

**41.** 407 U.S. at 91 n. 23, 92 S.Ct. at 1999 n. 23.

**42.** 503 F.Supp. 1075.

**43.** 16 U.S.C. §§ 1801–1882 (1978).

tion and is, therefore, invalid.[44] What procedure might be valid is not now before this court.[45] As the Supreme Court has often explained, due process is a flexible concept. Maritime liens supporting in rem jurisdiction and the arrest of a vessel arise in a variety of circumstances.[46] Procedures must therefore vary depending on the nature of the lien, the ownership interest of the party seeking arrest in the vessel, the possibility that the vessel will flee the jurisdiction and the governmental interest involved in the action. I observe, however, that in most cases involving private parties, due process would minimally appear to require the filing of non-conclusory allegations, judicial participation in issuance of the writ, and the opportunity for an immediate post-seizure hearing.

The arrest of the vessel BAY RIDGE is vacated and the case is DISMISSED.

---

**44.** It has been suggested that a federal district court lacks jurisdiction to declare a rule promulgated by the Supreme Court of the United States unconstitutional. *Harris v. Zion's Savings Bank*, 127 F.2d 1012, 1015 (10th Cir. 1942) *aff'd* 317 U.S. 447 (1943); *Bethlehem Steel Corp. v. S/T VALIANT KING*, 1977 A.M.C. at 1726. However, I find that in promulgating the Admiralty Rules the Supreme Court is acting in a rulemaking capacity as an administrative body designated by the Congress and thus has only the power which Congress could have exercised. Had Congress enacted Rule C this court could clearly have considered its constitutionality. *Grand Bahamas Pet. Co., Ltd. v. Canadian Transp. Agencies*, 450 F.Supp. at 449–51. Finally, I am not at all hesitant to declare the rule as applied unconstitutional ... who knows, I may never have another chance.

**45.** When local court rules add the steps demanded by the procedural due process require-

ments of the Constitution, Rule C is constitutional. *See e. g. Amstar Corp. v. M/V ALEXANDROS T.*, 431 F.Supp. at 332–34 where the court expressed grave doubts about the constitutionality of Rule C, but upheld it, in part because local rules required that a Chambers Judge be available nights and weekends, which was found to meet the *Mitchell* requirement of a speedy post-seizure hearing opportunity. *Cf. Merchants Nat. Bank v. Dredge GILLESPIE*, 488 F.Supp. at 1304–05, where the court pointed to "instanter" post-seizure hearing procedures provided under local rules in upholding Rule C.

**46.** *See generally*, Note, *Due Process in Admiralty Arrest and Attachment*, 56 Texas L.Rev. 1091, 1093–94 (1978).